[No. 62326-1.   En Banc.   May 11, 1995.]

CITIZENS ALLIANCE TO PROTECT OUR WETLANDS, *Appellant*, v. THE CITY OF AUBURN, ET AL, *Respondents*, WASHINGTON THOROUGHBRED BREEDERS ASSOCIATION, ET AL, *Intervenors*.

*Jeffrey M. Eustis,* for appellant.

*Michael J. Reynolds, Acting City Attorney,* and *Judith Curtin Ausman* and *Karen Carlson Gulliver, Assistants,* for respondent City of Auburn.

*Buck & Gordon, Peter L. Buck, Brent Carson,* and *Shelley E. Kneip,* for respondents Northwest Racing Associates, et al.

*Philip E. Cutler* and *Cutler & Nylander,* for respondents Metro Sand & Gravel, et al.

*Williams, Kastner & Gibbs,* by *Randy J. Aliment* and *Dennis D. Reynolds,* for intervenors.

*Christine O. Gregoire, Attorney General,* and *Meredith Wright Morton, Senior Counsel,* amicus curiae.

GUY, J. — Northwest Racing Associates (NWRA) has proposed to build a thoroughbred racetrack in Auburn, Washington. Citizens Alliance To Protect Our Wetlands (CAPOW) opposes the racetrack, contending the final environmental impact statement prepared by the City of Auburn does not adequately discuss alternative sites for the track and fails to analyze the impacts of increased traffic on an already congested area. CAPOW appeals from a ruling of the King County Superior Court which upheld the adequacy of the environmental impact statement. We affirm the Superior Court.

## FACTS

For nearly 60 years, thoroughbred horses raced at the Longacres track in Renton, Washington. In September 1990, the Boeing Company purchased the Longacres property, and racing continued at Longacres until Boeing razed the track at the end of the 1992 season. Thoroughbred racing now no longer takes place in Western Washington.

Immediately after Boeing purchased the racetrack, the Washington Horse Racing Commission (Commission), a state agency empowered under RCW 67.16 to regulate horse racing, began the search for a successor to Longacres. The Com-

mission accepted applications from groups proposing race-tracks in Lacey, Fife, and Auburn. On April 20, 1993, the Commission denied a license for racing in Lacey or Fife.[1] The Commission approved the proposal from NWRA and expressed its intent to grant NWRA a license to operate a thoroughbred racetrack in Auburn.

To operate a parimutuel thoroughbred racetrack, an owner must have a license from the Commission. RCW 67.16.020.

Prior to obtaining its license, NWRA had approached the City of Auburn and proposed building the racetrack. On October 8, 1992, Auburn made a determination of signifi-cance under the State Environmental Protection Act of 1971 (SEPA) and issued a request for comments on the scope of the draft environmental impact statement (DEIS). The pro-posal envisioned a horse racing park on approximately 190 acres, including a 1-mile oval racetrack, a $1/2$-mile training track, horse stalls, grandstand, restaurants, betting windows and parking.

The determination of significance also noted that, "[t]he proposal will require an amendment to the City of Auburn Comprehensive Plan Map from Heavy Industrial to Light Industrial, a rezone of approximately 150 acres of the site". Return of Record vol. 1, at 359. NWRA's property contained two parcels, one small area zoned M-1 (light industrial), and one large area zoned M-2 (heavy industrial). Auburn's zon-ing code permitted commercial recreation, including animal racing, under M-1. Because the bulk of NWRA's property was zoned M-2, NWRA requested Auburn to rezone the parcel to light industrial.

After reviewing public comments, Auburn began work on the DEIS. The City hired an independent consultant to prepare the environmental impact statement (EIS), subject to a 3-party agreement. NWRA paid for the EIS by deposit-

---

[1]The Commission concluded, "both the Capitol Downs site in Lacey and the Fife site in Fife are outside the general proximity of the support infrastructure which has been built, at substantial cost, by members of the industry." Return of Record vol. 1, at 106.

ing money with Auburn, which in turn paid the independent consultant. NWRA had no direct control over the content of the EIS; Auburn's planning department had complete responsibility for the DEIS and the final environmental impact statement (FEIS).

On March 25, 1993, Auburn issued its 444-page DEIS. The DEIS considered two alternatives to NWRA's proposed racetrack: (1) the "Auburn Downs" site first proposed as a harness racing facility in 1983, and (2) the no action alternative. To arrive at these alternatives, Auburn identified three potential sites in the city other than NWRA's that were large enough to accomodate a racetrack. After considering the impact of construction on these sites, Auburn concluded that all of them, including the Auburn Downs site, had fatal flaws and were therefore not reasonable, feasible alternatives to NWRA's proposal.

The City nonetheless included Auburn Downs as an alternative. Because Auburn had issued an FEIS on the Auburn Downs site in 1983, it updated the EIS in 1992 and evaluated Auburn Downs as the most likely alternative. Auburn did not review any sites outside of the city, concluding it had no authority " 'to control impacts either directly, or indirectly through requirement of mitigation measures.' " Return of Record vol. 2, at 507 (quoting WAC 197-11-440(5)-(b)(iii)).

Shortly after Auburn issued the DEIS, NWRA withdrew its request for a rezone and asked instead that the City amend its zoning code. NWRA proposed that the City allow commercial recreation as a conditional use for lands zoned M-2 (heavy industrial). This text amendment would require NWRA to receive a conditional use permit before building the racetrack.

In response to comments on the DEIS, NWRA modified its proposal to reduce the destruction of wetlands from 53 acres to 17.4 acres. NWRA also relocated the facilities in the racetrack to reduce the number of acres used.

On September 30, 1993, Auburn issued a 781-page FEIS. Like the DEIS, the FEIS discussed two alternatives to

NWRA's proposal: the Auburn Downs site and the no action alternative. The FEIS also concluded that the text amendment to the M-2 zoning category was consistent with the City's land use policies.

Throughout these proceedings, CAPOW actively opposed the plans for a racetrack. On October 8, 1993, CAPOW appealed the adequacy of the FEIS to a hearing examiner for the City of Auburn. The examiner held a 3-day hearing, and on January 4, 1994, ruled that the FEIS was adequate.

On March 21, 1994, following significant debate, the Auburn City Council amended the zoning code to allow commercial recreation, including animal racetracks, in the M-2 zone as a conditional use. On June 20, 1994, the city council granted a conditional use permit to NWRA subject to some 83 conditions. On July 20, 1994, CAPOW petitioned in superior court for a writ of review, declaratory judgment and injunctive relief to halt construction of the racetrack. After a bench trial, the Superior Court concluded the FEIS was adequate, denied CAPOW's petition and entered judgment for NWRA.

CAPOW appealed to the Court of Appeals, and on December 20, 1994, the Commissioner of the Supreme Court granted NWRA's motion to transfer the appeal to this court.

## ISSUES

CAPOW's appeal presents four issues: (1) did the FEIS discuss sufficiently the offsite alternatives to the proposed racetrack, (2) did the FEIS discuss sufficiently the onsite alternatives to the proposed racetrack, (3) did the FEIS adequately disclose impacts to traffic from the racetrack, and (4) were the hearing examiner's findings of fact and conclusions of law sufficient?

## ANALYSIS

■■ We review challenges to the adequacy of an EIS under the rule of reason.

The adequacy of an EIS is tested under the "rule of reason". *SEAPC v. Cammack II Orchards*, 49 Wn. App. 609, 614-15, 744 P.2d 1101 (1987); *Cheney v. Mountlake Terrace*, 87 Wn.2d 338, 344-45, 552 P.2d 184 (1976). In order for an EIS to be

adequate under this rule, the EIS must present decisionmakers with a "reasonably thorough discussion of the significant aspects of the probable environmental consequences" of the agency's decision. *Cheney*, 87 Wn.2d at 344-45 (quoting *Trout Unlimited v. Morton*, 509 F.2d 1276, 1283 (9th Cir. 1974)). The rule of reason is "in large part a broad, flexible cost-effectiveness standard", in which the adequacy of an EIS is best determined "on a case-by-case basis guided by all of the policy and factual considerations reasonably related to SEPA's terse directives". R. Settle, [*The Washington State Environmental Policy Act: A Legal and Policy Analysis*] § 14(a)(i) [(4th ed. 1993)].

*Klickitat Cy. Citizens Against Imported Waste v. Klickitat Cy.*, 122 Wn.2d 619, 633, 860 P.2d 390, 866 P.2d 1256 (1993).

Because CAPOW disputes the discussion of particular environmental factors in the FEIS, this court "must determine whether the environmental effects of the proposed action are sufficiently disclosed, discussed, and substantiated by supportive opinion and data." *Klickitat Cy.*, 122 Wn.2d at 644.

We do not rule on the wisdom of the proposed development but rather on whether the FEIS gave the city council sufficient information to make a reasoned decision.

By passing a text amendment in the context of a proposed development, Auburn has combined a "nonproject action" with a "project action". NWRA first sought a rezone of its parcel from heavy to light industrial. Midway through the permitting process, NWRA changed course and requested the city council to amend the M-2 zoning classification to allow commercial recreation as conditional use.

The SEPA rules characterize NWRA's proposed racetrack as a project action. Project actions involve

a construction or management activity located in a defined geographic area. Projects include and are limited to agency decisions to:

(i) License, fund, or undertake any activity that will directly modify the environment, whether the activity will be conducted by the agency, an applicant, or under contract.

(ii) Purchase, sell, lease, transfer, or exchange natural resources, including publicly owned land, whether or not the environment is directly modified.

WAC 197-11-704(2)(a). In contrast, Auburn's amendment to its zoning code is a nonproject action. The SEPA rules define nonproject actions as

decisions on policies, plans, or programs.

(i) The adoption or amendment of legislation, ordinances, rules, or regulations that contain standards controlling use or modification of the environment;

(ii) The adoption or amendment of comprehensive land use plans or zoning ordinances . . ..

WAC 197-11-704(2)(b).

The significance of this distinction appears in the description of a nonproject EIS.

The lead agency shall have more flexibility in preparing EISs on nonproject proposals, because there is normally less detailed information available on their environmental impacts and on any subsequent project proposals. The EIS may be combined with other planning documents.

WAC 197-11-442(1). When an agency writes an EIS for a nonproject action, it must

discuss impacts and alternatives in the level of detail appropriate to the scope of the nonproject proposal and to the level of planning for the proposal. Alternatives should be emphasized.

WAC 197-11-442(2).

Therefore, the controversies in this case surround two interrelated actions: the proposed racetrack (the project action) and the amendment to the zoning code (the nonproject action). CAPOW argues that both actions required Auburn to discuss alternative sites in more detail. NWRA contends the FEIS adequately examines the environmental consequences of both actions.

## Reasonable Alternative Sites

CAPOW contends the FEIS failed to identify and examine (1) offsite and (2) onsite alternatives to the proposed

racetrack. The SEPA rules define reasonable alternatives as
actions that could feasibly attain or approximate a proposal's objectives, but at a lower environmental cost or decreased level of environmental degradation.

(i) The word "reasonable" is intended to limit the number and range of alternatives, as well as the amount of detailed analysis for each alternative.

WAC 197-11-440(5)(b). NWRA and Auburn assert that because no reasonable, *feasible* alternative exists to the Auburn site, the FEIS discusses alternatives in far greater detail than that required under SEPA.

A. Offsite Alternatives.

The Washington Horse Racing Commission received proposals for racetracks in Lacey and Fife. CAPOW faults the FEIS for not discussing these sites as reasonable alternatives to Auburn. In addition, CAPOW claims the Commission found the one alternative site discussed in the FEIS, Auburn Downs, unacceptable.

NWRA responds by arguing the SEPA rules do not require consideration of offsite alternatives in this case.

When a proposal is for a private project on a specific site, the lead agency shall be required to evaluate only the no action alternative plus other reasonable alternatives for achieving the proposal's objective on the same site. This subsection shall not apply when the proposal includes a rezone, unless the rezone is for a use allowed in an existing comprehensive plan that was adopted after review under SEPA. Further, alternative sites may be evaluated if other locations for the type of proposed use have not been included or considered in existing planning or zoning documents.

WAC 197-11-440(5)(d). Under this private project exception, the lead agency may choose not to analyze offsite alternatives to a proposed development. The SEPA rules require the lead agency to examine only the no action and onsite alternatives.

██ We find NWRA's proposed racetrack qualifies for the private project exception. A private organization, NWRA, initiated and sponsored the proposed development. *See* WAC 197-11-780. Moreover, thoroughbred horse racing is not a traditional governmental function, nor has it been a

responsibility of the City of Auburn. *Weyerhaeuser v. Pierce Cy.*, 124 Wn.2d 26, 40-41, 873 P.2d 498 (1994). The project action, the proposed racetrack, does not compel Auburn to analyze offsite alternatives.

Because there is also a nonproject action involved in this case, Auburn is obligated to review offsite alternatives. Under the circumstances of this case, the level of detail required to examine alternatives corresponds to that used to analyze the proposed racetrack. "The EIS content may be limited to a discussion of alternatives which have been formally proposed or which are, while not formally proposed, reasonably related to the proposed action." WAC 197-11-442(4). The proposed racetrack provides a ready yardstick to measure the environmental consequences of allowing commercial recreation as a conditional use of lands zoned heavy industrial.

The text amendment to the zoning code bears a close relation to the proposed development. NWRA formally proposed the text amendment as a substitute for rezoning the property. The purpose of the text amendment was to enable the development to proceed. Auburn considered the text amendment in the context of permitting the construction of the racetrack and examined the environmental consequences of the text amendment in the body of the project FEIS. The proposed racetrack and the text amendment are intertwined.

We do not imply that a text amendment is the functional equivalent of a rezone. This court has drawn a clear line between rezones and text amendments. In *Raynes v. Leavenworth*, 118 Wn.2d 237, 248, 821 P.2d 1204 (1992), the court concluded:

> There is a distinction between rezoning a specific site and amendments which modify the text of a zoning ordinance. *See* R. Settle, *Washington Land Use and Environmental Law and Practice* § 2.11 (1983). Actions of a city council are rezones when there are "specific parties requesting a classification change for a specific tract." *Cathcart-Maltby-Clearview Comm'ty Coun. v. Snohomish Cy.*, 96 Wn.2d 201, 212, 634 P.2d 853 (1981) . . ..
> Here, the text amendment is of areawide significance because it

affects the entire TC district, not just a specific tract. In addition, the amendment conforms with the Leavenworth Comprehensive Plan and was enacted to benefit the entire city. Thus, the proceedings concerning the amendment did not involve rezoning.

■ The same distinction is meaningful under SEPA. Normally, under the private project exception, private projects which do not require rezones will not compel lead agencies to examine offsite alternatives. The existence of a text amendment, or any other nonproject action, does not eliminate this exception. Instead, nonproject actions pose *separate* obligations under SEPA which a lead agency must satisfy. The environmental significance of the nonproject action creates the obligation to examine alternatives to the nonproject action. Here, the project and nonproject actions are intertwined, and Auburn decided to examine the significance of both in the same EIS. Under these circumstances, SEPA requires an examination of reasonable alternatives to the nonproject action, *i.e.*, the text amendment. In practice, Auburn had to look at reasonable, feasible offsite alternatives to the building of a racetrack on lands zoned heavy industrial.

We do not conclude that every nonproject action requires such analysis. The SEPA rules underscore flexibility and gauge the level of detail according to the proposal at issue.

We now turn to whether Auburn adequately discussed offsite alternatives in the FEIS, beginning with alternative sites within the city limits.[2] Under the rule of reason, we find the FEIS sufficient. The FEIS discusses the potential consequences of the text amendment and finds the amendment consistent with the City's comprehensive plan. Because commercial recreation is already a conditional use for lands zoned M-1 (light industrial), the consequences of add-

---

[2]NWRA contends CAPOW did not object below to Auburn's analysis of the nonproject action and therefore cannot raise the argument here. Had Auburn dealt separately with the environmental consequences of the text amendment, CAPOW might have failed to exhaust its remedies. Auburn incorporated its discussion of the text amendment in the FEIS and, therefore, CAPOW may raise nonproject obligations as an objection to the adequacy of the FEIS.

ing this use to M-2 is negligible. In addition, no one has developed commercial recreational facilities in Auburn, even though such uses have been permitted on M-1 lands for some time.

The FEIS also examines three sites within Auburn as potential alternatives: Auburn Downs, the Hendley or Riverbend site, and the Glacier Park site. All three contain flaws which render them unfeasible for development into a racetrack. This finding alone is sufficient consideration of alternatives. Auburn nonetheless included Auburn Downs as an alternative site throughout the FEIS. We find the FEIS sufficiently discloses, discusses, and substantiates the lack of alternative sites within the city.

CAPOW argues that Auburn failed to discuss alternative sites in Fife and Lacey, outside Auburn's city limits. Under the rule of reason, we find sufficient analysis in the FEIS of offsite alternatives. Auburn did not discuss alternative sites outside the city limits, citing WAC 197-11-440(5)(b)(iii): "Reasonable alternatives *may be* those over which an agency with jurisdiction has authority to control impacts either directly, or indirectly through requirement of mitigation measures." (Italics ours.) The phrase "may be" is significant. " 'May' is optional and permissive and does *not* impose a requirement." WAC 197-11-700(3)(b). Thus, under the SEPA rules, a municipality chooses whether to limit its review to sites within its borders.

We conclude Auburn did not abuse this discretion. First, as discussed above, the proposed racetrack qualifies for the exemption granted to private projects under WAC 197-11-440(5)(d). The project action (the racetrack) therefore did not oblige Auburn to examine offsite alternatives in its FEIS. Second, the nonproject action (the text amendment) did not dictate analysis of alternative sites outside the city. CAPOW presents no evidence that amending Auburn's zoning code will have significant environmental effects outside the city, and Auburn concluded the text amendment was consistent with the City's comprehensive plan. Therefore, we conclude Auburn acted within the discretion delegated

under the SEPA rules to narrow consideration of alternative sites.

We find the FEIS discussed sufficiently the offsite alternatives to the proposed development.

### B. Onsite Alternatives.

CAPOW argues that Auburn did not adequately address the existence of onsite alternatives. We find no merit in this claim.

As first proposed, the racetrack covered nearly 200 acres, including 53 acres of wetlands. Most of these wetlands were at the southern end of the property. By eliminating a practice track and moving the parking lot, NWRA preserved the southern parcel, reducing the disrupted wetlands to 17.4 acres. NWRA also scaled back the project from 190 to 165 acres.

Given these significant modifications which resulted from preparation of the DEIS and FEIS, Auburn complied fully with the requirement to consider onsite alternatives. CAPOW contends *further* alternatives do not appear in the FEIS. CAPOW offers no additional, feasible onsite alternatives.

This court upholds the discussion of onsite alternatives in the FEIS. The incorporation of environmental considerations into land use planning, the aim of SEPA, took place in this case.

### Impacts on Traffic

CAPOW claims the FEIS failed to disclose fully the impact of the racetrack on traffic congestion in Auburn. CAPOW's criticism is one of detail — asserting that the FEIS lumped the impacts on traffic into the phrase "Worse LOS F". "LOS" stands for level of service and "F" represents conditions of gridlock.

CAPOW's argument does not survive the rule of reason. The FEIS devotes 42 pages to an extensive description of traffic problems, conceding that the racetrack will make a bad situation worse. Traffic on State Route 167, the main road leading to the project, already suffers from severe con-

gestion. By adding the racetrack, Auburn will face traffic jams which rival Seattle's after a game at the Kingdome.

The FEIS describes the impacts to traffic in more than sufficient detail to warn Auburn of the likely consequences of the racetrack. The phrase "Worse LOS F" summarizes what appears throughout the 42-page analysis: the impacts to traffic are substantial. Under the rule of reason, the FEIS successfully discusses, discloses, and substantiates the effects of this proposal on Auburn's traffic.

### Sufficiency of Hearing Examiner's Findings and Conclusions

CAPOW claims the hearing examiner's findings of fact suffer from the same defects as those struck down in *Weyerhaeuser v. Pierce Cy.*, 124 Wn.2d 26, 873 P.2d 498 (1994). The court in *Weyerhaeuser* concluded:

> The findings and conclusions [of the hearing examiner] are clearly inadequate to determine the basis for the hearing examiner's decision upholding the adequacy of the EIS. . . . There is also no way to tell how the hearing examiner concluded the EIS was adequate — he never addressed whether the EIS contains a proper discussion of alternatives to the proposed site . . .[.]

*Weyerhaeuser*, 124 Wn.2d at 36-37. CAPOW asserts similar flaws with the hearing examiner's findings.

*Weyerhaeuser* was an extreme case of noncompliance —the hearing examiner concluded "[t]he Environmental Impact Statement filed as a final EIS is adequate", with no explanation whatsoever. *Weyerhaeuser*, 124 Wn.2d at 36. The hearing examiner in this case filed a single-spaced, 10-page ruling with substantial analysis of every issue. Because a reviewing court can determine the basis for her decision, the hearing examiner's findings are sufficient.

### CONCLUSION

Auburn has complied with its obligations under SEPA for both the project and nonproject actions at issue. The FEIS examines in great detail every significant environmental impact from the proposed racetrack. The FEIS does not

370

attempt to minimize or gloss over the disadvantages to building a regional recreation center in Auburn. Under the rule of reason, the FEIS informs Auburn's decisionmakers of the environmental consequences of the racetrack in sufficient detail to make a reasoned decision.

We affirm the ruling of the Superior Court.

DURHAM, C.J., DOLLIVER, SMITH, MADSEN, and ALEXANDER, JJ., and UTTER, J. Pro Tem., concur.