**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | | |
|---|---|---|
| ESCALA OWNERS ASSOCIATION, | ) | No. 83037-6-I |
| | ) | |
| Appellant, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| CITY OF SEATTLE; JODI | ) | |
| PATTERSON O'HARE; G4 CAPITAL | ) | |
| SEATTLE HOLDINGS, LLC, 1921-27 | ) | |
| FIFTH AVENUE HOLDINGS 591683; | ) | |
| 1921-27 FIFTH AVENUE HOLDINGS | ) | |
| LLC, | ) | |
| | ) | UNPUBLISHED OPINION |
| Respondents. | ) | |
| | ) | |

MANN, J. — This case is about the City of Seattle's review and approval of a 48-story mixed use building in the downtown core (project) proposed by Jodi Patterson O'Hare, G4 Capital Seattle Holdings, LLC, 1921-27 Fifth Avenue Holdings 591683, and 1921-27 Fifth Avenue Holdings LLC (Applicants). We are asked to determine whether the City's review process complied with Washington's State Environmental Policy Act of 1971 (SEPA), ch. 43.21C RCW.

The owners of an adjacent condominium, Escala Owners Association (Escala), appeal a decision by the King County Superior Court affirming the City hearing

Citations and pin cites are based on the Westlaw online version of the cited material.

examiner's determination that the City complied with SEPA. Escala argues that: (1) the City erred by adopting an existing 2005 environmental impact statement (EIS) as part of its SEPA review, (2) the City erred by relying on addenda as part of its SEPA review of the project, and (3) that the project's EIS was inadequate. We affirm.

## I. SEPA PROCESS

Before addressing the facts specific to this case, we first provide a brief overview of the SEPA process. SEPA requires the analysis and disclosure of probable significant environmental impacts of a proposal. WAC 197-11-060(4). A proposal may either be a particular development proposal (a project action), or a legislative or policy change (a nonproject action). WAC 197-11-704. The first step in the SEPA process is for an agency to determine whether a proposal will "significantly [affect] the quality of the environment." RCW 43.21C.030(C). This step is known as a "threshold determination." RCW 43.21C.033; WAC 197-11-310. A threshold determination produces either a determination of significance (DS) or a determination of nonsignificance (DNS). WAC 197-11-310(5).

If an agency determines that a proposal may have significant adverse environmental impacts, it issues a DS. WAC 197-11-360. Issuance of a DS triggers the requirement that the agency prepare an EIS that includes an analysis of alternatives to the proposal. RCW 43.21C.030; WAC 197-11-736. If an agency determines that a proposal will not significantly affect the environment, it issues a DNS and an EIS is not required. WAC 197-11-340.[1]

---

[1] While not relevant here, an alternative threshold determination is the "mitigated determination of non-significance," or "MDNS," which involves changing or conditioning a project to eliminate its significant adverse environmental impacts. WAC 197-11-350. A MDNS does not require promulgation of a formal EIS.

Preparing an EIS requires several steps. The agency first invites public comments on the scope of the EIS. Scoping involves identifying probable significant adverse impacts and reasonable alternatives. WAC 197-11-408. The agency then prepares a draft EIS that it must circulate to the public and affected agencies for comment. WAC 197-11-400 to -455; WAC 197-11-460; WAC 197-11-500 to -550. The agency must then prepare a final EIS that addresses and responds to the comments received. WAC 197-11-560.

Instead of preparing a new EIS for every proposal, an agency may also rely on "existing environmental documents," including an EIS prepared for an earlier proposal, to provide analysis. RCW 43.21C.034; WAC 197-11-600. SEPA allows adoption of existing environmental documents where the proposal currently being reviewed is either the same as, or different than, the proposal previously analyzed. WAC 197-11-600(2). If additional analyses is necessary, the agency can prepare an addendum "that adds analysis or information about a proposal but does not substantially change the analysis of significant impacts and alternatives in the existing document." WAC 197-11-600(4)(c). The agency must prepare a supplemental EIS (SEIS) if there are "substantial changes so that the proposal is likely to have significant environmental impacts," or there is "new information indicating a proposal's probable significant adverse environmental impacts." WAC 197-11-600(4)(d)(i), (ii).

## II. FACTS

### A. Downtown EIS

In January 2005, the City issued an EIS for a nonproject proposal to change zoning requirements for a portion of the downtown office core (Downtown EIS). Along

with a "no action alternative," the Downtown EIS examined four alternatives that allowed for a significant increase in height and density for downtown development. The Downtown EIS identified and analyzed a range of environmental impacts that could arise from an increase in density. Topics addressed included: housing, land use, height, bulk, and scale, employment, transportation, and parking. The Downtown EIS recognized that the change in zoning would result in a major change to downtown land uses:

> Under all alternatives if forecasted development occurs, land uses in the study area would be significantly transformed by the increased density of residential and commercial development. This transformation is interpreted to be consistent with the City's Comprehensive Plan and neighborhood plans for the study area and is not interpreted to be a significant unavoidable adverse impact.

After the issuance of the Downtown EIS, the City adopted new zoning for the downtown core consistent with the preferred alternative considered in the EIS. The zoning for the area at issue was changed to Downtown Office Core 2 (DOC 2), which allows a maximum height of 550 feet for structures with residential uses. SMC 23.49.008(A)(3).

Since 2005, the City has repeatedly adopted the Downtowns EIS, along with project specific SEPA addenda, as part of its SEPA review of specific downtown residential, office, commercial, and hotel development projects.

B. Escala Condominium

In 2009, construction of the Escala Condominiums was completed. Escala is a 30-story residential tower with over 400 residents located at 1920 4th Avenue (the corner of 4th Avenue and Virginia Street). An alley runs behind Escala, connecting Virginia and Stewart Streets, and bisecting the block bounded by 4th and 5th Avenues.

The figure below shows Escala's location at 1920 4th Avenue. The figure also illustrates the alley bisecting 4th and 5th Avenues. Escala residents rely on the alley for delivery services, emergency services, as well as for waste and recycling collection services. Some of Escala's units are located adjacent to the alley.



### C. The Project

The Applicants propose to develop a 48-story mixed use building containing retail and restaurant space, a 155 room hotel, and 431 apartments. The project is located at 1933 5th Avenue. The project will include parking for 239 vehicles below grade. Access to the parking lot and loading dock will be via the alley shared with Escala. The figure above highlights the location of the construction site.

The project requires a master use permit (MUP) administered by the Seattle Department of Construction and Inspections (Department). MUP approval requires review under SEPA and the City's design review process. The design review process ensures that projects are consistent with the citywide design guidelines. A project that is approved under the design review process is presumed to comply with the City's SEPA height, bulk, and scale policies. SMC 25.05.675(G)(2)(C).

Design review began July 7, 2015, with an early design guidance meeting where the design review board (DRB) heard the Applicant's analysis and took public comments. After changes to the project design, the DRB held two more early design guidance meetings in 2015, followed by a first recommendation meeting on June 28, 2016. After additional design changes, the DRB voted unanimously to recommend approval of the project at its final meeting on December 20, 2016.

The City's SEPA review of the project consisted of several interrelated steps. On December 15, 2016, the City issued a SEPA DS. As part of the DS, the City adopted the 2005 FEIS, determining that the project's impacts will be within the 2005 FEIS's range of impacts and its mitigating measures. The City also adopted a SEPA addendum containing project-specific analyses.

After receiving public comments, on July 3, 2017, the Department issued a revised addendum replacing the December 2016 version. A second notice of DS was also issued on July 3, 2017.[2] The second notice of DS adopted the 2005 Downtown EIS along with the revised addendum. The notice explained that the Director:

> has determined that the referenced proposals could have probable significant adverse environmental impacts under [SEPA] on the land use; environmental health; energy/greenhouse gas emissions; aesthetics (height, bulk and scale; light, glare and shadows; views); wind; historic and cultural resources; transportation and parking; and construction elements of the environment.
>
> [The Department] has identified and adopts the [Downtown EIS]. [The Department] has determined that the proposal's impacts for the current Master Use Permit application have been adequately analyzed in the referenced FEIS. The FEIS was prepared by the city of Seattle. That document meets [the Department's] SEPA responsibilities and needs for

_____

[2] The December 2016 notice of DS stated the proposal was "likely to have probable significant adverse environmental impacts." The July 2017 notice of DS changed the wording to "could have probable significant adverse environmental impacts."

the current proposal and will accompany the proposal to the decisionmaker.

The current Addendum has been prepared to add specific information on land use; environmental health; energy/greenhouse gas emissions; aesthetics (height, bulk and scale; light, glare and shadows; views); wind; historic and cultural resources; transportation and parking; and construction impacts from the current proposal and discusses changes in the analysis in the referenced FEIS. Pursuant to SMC 25.05.625-630, this current Addendum does not substantially change analysis of the significant impacts and alternatives in the FEIS.

On October 27, 2017, the Department issued its MUP decision approving the project. The decision granted design review approval and SEPA review approval. Relying on the Downtown EIS and revised addendum, the MUP decision addressed the project's environmental impacts on construction, environmental health, greenhouse gas emissions, height, bulk, and scale, historic resources, land use, light and glare, parking, public views, shadows on open spaces; and transportation. For each area of review, the MUP decision determined that no significant adverse impacts were anticipated by the project.

D. Administrative Appeal

On November 9, 2019, Escala appealed the MUP decision to the City hearing examiner. After a multiday hearing, the hearing examiner affirmed the MUP Decision in respect to design review and the legal adequacy of the City's SEPA review of the project's potential environmental impacts related to transportation, alley operations, height, bulk, and scale, and land use compatibility elements. The hearing examiner determined, however, that the City erred by failing to evaluate the impacts related to loss of light on human health. The hearing examiner remanded to the City for further analysis of the project's impacts as they relate to loss of light within the Escala

residential units. The hearing examiner otherwise affirmed the DS, subject to the addition of a loading dock management plan.

Following the remand, the Department evaluated the health impacts from light using analysis prepared by three experts. The Department then issued a draft lighting addendum for comment. Escala and its consultants submitted extensive comments and analysis. The Applicants also responded providing additional analysis and an explanation of the methodology used by its consultant. Following a 19-month review period, the Department issued a revised MUP Decision, including the adopted Downtown EIS and the lighting addendum.

On May 5, 2020, Escala appealed the revised MUP Decision. The hearing examiner upheld the revised MUP Decision, finding that the Department provided a reasoned and thoughtful analysis. The hearing examiner concluded that Escala failed to demonstrate any new probable significant adverse impacts to the health of its residents.

Escala petitioned for review of the hearing examiner's decisions before the King County Superior Court. On July 30, 2021, the superior court dismissed Escala's petition.

Escala appeals.[3]

---

[3] On September 23, 2021, this court linked Escala's appeal to that of another proposed site on the same block. See Escala Owners Association v. City of Seattle, No. 82568-2-I (Wash. Ct. App. July 25, 2022). We write separately to address the issues raised in that opinion, but each share similar analyses.

## III. ANALYSIS

### A. SEPA Compliance

Escala argues that the Department failed to comply with SEPA. Specifically, Escala asserts that the Department erred because: (1) it improperly adopted the Downtown EIS, (2) even if properly adopted, the Downtown EIS does not contain adequate information and analysis required by SEPA, and (3) it is improper to rely on the addenda to analyze the project's environmental impacts. We disagree.

#### 1. Standard of Review

This matter is before us under the Land Use Petition Act (LUPA), ch. 36.70C RCW. In reviewing a LUPA decision, we sit in the same position as the superior court and apply the LUPA standards of review directly to the hearing examiner's decision. Wenatchee Sportsmen Ass'n v. Chelan County, 141 Wn.2d 169, 176, 4 P.3d 123 (2000). Our review is confined to the record created before the hearing examiner. RCW 36.70C.120(1).

Under LUPA, "a court may grant relief from a local land use decision only if the party seeking relief has carried the burden of establishing that one of six standards listed in RCW 36.70C.130(1) has been met." Wenatchee Sportsmen, 141 Wn.2d at 175. Because Escala seeks relief from the Department and the hearing examiner's decision, it bears the burden on appeal. Pinecrest Homeowners Assn v. Cloninger & Assocs., 151 Wn.2d 279, 288, 87 P.3d 1176, (2004). The relevant standards of review include:

> (b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;

(c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;

(d) The land use decision is a clearly erroneous application of the law to the facts.

RCW 36.70C.130(1)(b)-(d).

"We review the agency's factual findings under the substantial evidence standard and conclusions of law de novo." Wenatchee Sportsmen, 141 Wn.2d at 176. Substantial evidence is "a sufficient quantum of evidence in the record to persuade a reasonable person that the declared premise is true." Wenatchee Sportsmen, 141 Wn.2d at 176. We review an application of facts to the law under the clearly erroneous standard. Wenatchee Sportsmen, 141 Wn.2d at 176. Such an application is clearly erroneous when, despite supporting evidence, "the reviewing court on the record is left with the definite and firm conviction that a mistake has been committed." Wenatchee Sportsmen, 141 Wn.2d at 176.

2. Adoption of the Downtown EIS

Escala first argues that the hearing examiner erred by affirming the Department's adoption of the Downtown EIS as part of its SEPA analysis of the project. Adoption of an EIS is procedurally allowed under SEPA where certain conditions are met. WAC 197-11-600. The hearing examiner's determination that the City properly adopted the 2005 FEIS is an application of law to facts and subject to the "clearly erroneous" standard of review. RCW 36.70C.130(1)(d).

As discussed above, SEPA contemplates using existing SEPA documents for subsequent proposals. "To avoid 'wasteful duplication of environmental analysis and to reduce delay,' the SEPA rules encourage and facilitate reusing existing environmental

documents." Thornton Creek Legal Defense Fund v. City of Seattle, 113 Wn. App. 34, 50, 52 P.3d 522 (2002) (quoting RICHARD L. SETTLE, THE WASHINGTON STATE ENVIRONMENTAL POLICY ACT: A LEGAL AND POLICY ANALYSIS § 15, at 209 (2001)). "Under certain circumstances, 'existing documents may be used to meet all or part of an agency's responsibility under SEPA.'" Thornton Creek, 113 Wn. App. at 50 (quoting SMC 25.05.600(A)). SEPA authorizes the use of existing documents under these circumstances:

> Lead agencies are authorized to use in whole or in part existing environmental documents for new project or nonproject actions, if the documents adequately address environmental considerations set forth in RCW 43.21C.030. The prior proposal or action and the new proposal or action need not be identical, but must have similar elements that provide a basis for comparing their environmental consequences such as timing, types of impacts, alternatives, or geography. The lead agency shall independently review the content of the existing documents and determine that the information and analysis to be used is relevant and adequate. If necessary, the lead agency may require additional documentation to ensure that all environmental impacts have been adequately addressed.

RCW 43.21C.034.

Under the SEPA rules, "an agency may use environmental documents that have previously been prepared in order to evaluate proposed actions, alternatives, or environmental impacts." WAC 197-11-600(2). "The proposals may be the same as, or different than, those analyzed in the existing documents." WAC 197-11-600(2); SMC 25.05.600(A). The Seattle Municipal Code also requires that the earlier document need be "accurate and reasonably up-to-date." SMC 25.05.600.

The SEPA rules provide that existing environmental documents may be used for a new proposal by adoption, incorporation by reference, incorporating an addendum, or preparing a SEIS:

(4) Existing documents may be used for a proposal by employing one or more of the following methods:

(a) "Adoption," where an agency may use all or part of an existing environmental document to meet its responsibilities under SEPA. Agencies acting on the same proposal for which an environmental document was prepared are not required to adopt the document; or

(b) "Incorporation by reference," where an agency preparing an environmental document includes all or part of an existing document by reference.

(c) An addendum, that adds analyses or information about a proposal but does not substantially change the analysis of significant impacts and alternatives in the existing environmental document.

(d) Preparation of a SEIS if there are:

(i) Substantial changes so that the proposal is likely to have significant adverse environmental impacts; or

(ii) New information indicating a proposal's probable significant adverse environmental impacts.

(e) If a proposal is substantially similar to one covered in an existing EIS, that EIS may be adopted; additional information may be provided in an addendum or SEIS (see (c) and (d) of this subsection).

WAC 197-11-600(4).

Under RCW 43.21C.034, the City was allowed to adopt the Downtown EIS if it had similar elements that provide a basis for comparing their environmental consequences such as timing, types of impacts, alternatives, or geography. RCW 43.21C.034. The hearing examiner determined that the Downtown EIS contained similar elements.

The hearing examiner found that the project was covered in the same timeline as the Downtown EIS. The Downtown EIS contemplated growth over a 20-year horizon from 2000 to 2020.[4] Save for delays in litigation, the anticipated opening date of the

---

[4] Counsel for the City admitted at oral argument that now that 17 years has passed since completion of the Downtown EIS, its utility may be nearing an end. Wash. Court of Appeals oral argument, No. 83037-6-I, (Mar. 9, 2022) at 14 min., 24 sec. We too have concerns regarding the Downtown EIS's utility for adoption when applied to new developments beyond the document's contemplated timeline. Nonetheless, the hearing examiner's finding that the Downtown EIS was timely was not clearly erroneous.

project was 2019.  The hearing examiner stated that "while the age of a document is within the range of considerations an agency could apply before adopting a document, there is no specific point in time identified in these regulations wherein the ability to adopt a document expires."

The Downtown EIS also evaluated the most of the types of impacts that could occur at the project sites.  The Downtown EIS evaluated potential impacts to land use, height, bulk and scale, and transportation under all alternatives.  This included impacts from additional height and density on shadows, light, and glare, as well as public services, and transportation.

The hearing examiner found that the project was within the geographic scope of the Downtown EIS.  The hearing examiner explained that the Downtown EIS "evaluated the probable significant environmental impacts that could result from the development following a change in zoning to allow additional height and density in the Downtown area."  The Downtown EIS studied the potential impacts of increased growth across all alternatives and evaluated the impacts of various height and density scenarios within the growth assumption.  The project property was within the area studied. [5]

The hearing examiner concluded that adoption of the Downtown EIS was appropriate, in part, because:

> The [Downtown EIS] provided environmental analysis for the upzone of
> the Downtown District.  The rezone established the zoning under which
> the project application was submitted—establishing the provisions that

---

[5] Escala points to a graphic attached as an appendix to the 2003 Draft EIS indicating that the project site was "not likely" to be developed.  Another graphic, however, also indicates that the "highest and best use" of the project location is "office and/or residential."  A third graphic in the body of the Downtown EIS identifies the entire block bounded by 4th and 5th Avenues and Stewart and Virginia Streets as "secondary" development sites.  The record supports that the project location was considered in the geographic scope of the Downtown EIS.

specifically allow for the proposal. The [Downtown EIS] specifically anticipated projects of the type represented by the proposal.

Adoption of the Downtown EIS was consistent with RCW 43.21C.034. The hearing examiner's decision approving its adoption as part of the SEPA review of the project was not clearly erroneous.

### 3. Adoption of Addenda

Escala argues next that, even if adoption of the Downtown EIS was allowed, it is inadequate because it fails to contain information required by SEPA. Escala's argument focuses solely on the contents of the Downtown EIS and does not address the additional analyses addressed in the addenda. Escala premises its argument on the incorrect assumption that the City erroneously adopted and relied on the addenda. Consequently, before reviewing the adequacy of the SEPA review, we first address Escala's argument that the analysis and information required in an EIS cannot be provided in addenda.

The SEPA rules provide that when an agency adopts or incorporates existing SEPA documents into its SEPA review, addenda and supplemental EISs may be prepared to remedy shortcomings in the documents that have been used. WAC 197-11-600(4)(a), (d); SMC 25.05.600(D)(3), (4). An addendum is the appropriate vehicle for adding analyses or information about a proposal that "adds analyses or information about a proposal but does not substantially change the analysis of significant impacts and alternatives in the existing environmental document." WAC 197-11-600(4)(c); SMC 25.05.600(D)(3).

By contrast, an agency must prepare an SEIS if there are "[s]ubstantial changes so that the proposal is likely to have significant adverse environmental impacts," or if

there is "[n]ew information indicating a proposal's probable significant adverse environmental impacts."  WAC 197-11-600(4)(d)(i), (ii); SMC 25.05.600(D)(4)(a), (b).

Here, following the adoption of the Downtown EIS, the City recognized that additional, site-specific analysis of the project was necessary.  As a result, the City analyzed the project in the original and revised Addenda evaluating impacts including land use, height, bulk, and scale, and transportation impacts.  After the hearing examiner determined that a human health analysis was necessary due to potential impacts of the loss of light in the eastern facing units of Escala, the City prepared the second Addendum, concluding that too many variables existed to make any determination that a loss of light would have effects on human health.  The conclusion of all Addenda was the same—the project would have no new significant impacts changing the analysis of impacts and alternatives in the 2005 FEIS.

The approach taken by the City is like that considered by this court in Thornton Creek, 113 Wn. App. at 52.  Thornton Creek involved a site specific "General Development Plan" (GDP) proposed for a site (the Northgate mall) within the larger Northgate "urban center."  The City's previous decision to designate Northgate as an urban center was reviewed in a nonproject EIS in 1992.  Thornton Creek, 113 Wn. App. at 43-44.  When considering the newer proposal, the City determined that the GDP was within the scope of the plans analyzed in the prior urban center EIS, and adopted the older EIS along with an addendum to satisfy SEPA.  Thornton Creek, 113 Wn. App. at 43-44.  We affirmed the City's approach concluding that sufficient similarity existed between the nonproject EIS and the GDP because "the proposals included in the GDP fell within the scope of development analyzed in [the] existing] EIS" and "the

-15-

environmental impact of the GDP was not substantially different from that analyzed in [the EIS]." Thornton Creek, 113 Wn. App. at 51.

Much like in Thornton Creek, the hearing examiner reviewed the Department's decision and determined that the Downtown EIS specifically addressed the scope and impact of developments like the project for the same geographic area. Citing Thornton Creek, and the Seattle Municipal Code, the hearing examiner rejected Escala's argument that the City was procedurally barred from adopting the Downtown EIS and using the Addenda.

Escala's argument is based on the false premise that, upon issuance of a DS for a proposal, the City's only option is preparation of a new EIS. On the contrary, adoption of the Downtown EIS along with the project specific Addenda did not ignore the requirement that an EIS be prepared; instead, it fulfilled it. RCW 43.21C.034 expressly authorizes use of existing environmental documents such as the Downtown EIS. The SEPA rules then expressly allow adoption of existing EISs along with incorporating projects specific addenda. WAC 197-11-600(4)(c). The hearing examiner's decision was not clearly erroneous.

4. Adequacy of the SEPA Review

We next address Escala's assertions that the City's SEPA review was inadequate. But unlike Escala's sole focus on the adequacy of the Downtown EIS, because we hold that the City correctly adopted the Downtown EIS and Addenda, we consider both the Downtown EIS and Addenda.[6]

---

[6] Because they are focused solely on the contents of the Downtown EIS, we do not address Escala's arguments that the Downtown EIS did not contain a summary of the project of the affected environment. The discussions within the addenda provide the analysis Escala is seeking.

The adequacy of an EIS is a question of law subject to de novo review. King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 138 Wn.2d 161, 183, 979 P.2d 374 (1999). We review EIS adequacy under the "rule of reason," which is a "broad, flexible cost-effective standard" where "the EIS must present decisionmakers with a reasonably thorough discussion of the significant aspects of the probable environmental consequences of the agency's decision." Citizens All. To Protect Our Wetlands v. City of Auburn, 126 Wn.2d 356, 361-62, 894 P.2d 1300 (1995). We must accord "substantial weight" to the agency's determination that an EIS is adequate. RCW 43.21C.090; King County, 138 Wn.2d at 183.

a. Alternatives

Escala's primary argument is that the City's decision adopting the Downtown EIS and Addenda failed to comply with SEPA's mandate to consider alternatives. We disagree.

We agree with Escala that an alternatives analysis is one of the key building blocks, if not the heart, of SEPA review. SEPA requires that an EIS identify and assess the impacts of reasonable alternatives to the proposal, including the no action alternative. RCW 43.21C.030. "The required discussion of alternatives to a proposed project is of major importance, because it provides a basis for a reasoned decision among alternatives having differing environmental impacts." Weyerhaeuser v. Pierce County, 124 Wn.2d 26, 38, 873 P.2d 498 (1994).

Escala's argument, however, ignores that the requirement for an alternatives analysis is only triggered where a new EIS or supplemental EIS is required. There is no dispute that an EIS must include an analysis of alternatives including the no action

alternative.  See WAC 197-11-400 (EIS shall inform decision makers and the public of reasonable alternatives); WAC 197-11-402 (EIS need analyze only the reasonable alternatives); WAC 197-11-440(5) (requirement for alternatives in EIS).  There is also no dispute that where a supplemental EIS is required, the supplemental EIS must include alternatives if they were not considered in the previously prepared EIS.  WAC 197-11-620; WAC 197-11-440.  But, contrary to Escala's argument, there is no similar requirement for an analysis of alternatives in an addendum.  See WAC 197-11-625.  Escala cites no authority for the proposition that an agency adopting an earlier EIS along with a site specific addendum is required to prepare a new alternatives analysis as part of the addendum.

The Downtown EIS considered four alternatives and the no action alternative.  The preferred alternative analyzed the impact of the proposed rezone from DOC2-300 to DOC2 500/300-500, which is the zoning that applies to the project location.  The City compared the preferred alternative against the other alternatives that analyzed different heights, densities, and types of downtown development.  This analysis compared the relative impacts of each alternative, including the no action alternative, to various elements of the environment including: housing, land use, height, bulk, and scale, views and aesthetics, and transportation.  Consistent with the Director's determination, the project's impacts are within the range of impacts considered in the Downtown EIS.  As a result, the alternatives analysis in the Downtown EIS satisfied SEPA.

The July 2017 revised addendum added to the analysis in the Downtown EIS by analyzing more specific project level impacts, including a comparison of existing conditions (i.e., "no action") with impacts from the proposal.  This included an analysis

of impacts to land use, height, bulk, and scale, light/glare/shadows, and transportation. In combination, the Downtown EIS and addendum provided a reasonably thorough discussion of alternatives.

b. Transportation

Escala next argues that the SEPA documents failed to provide a reasonably thorough discussion of the probable significant traffic impacts of the project associated with the alley running between the Escala condominiums and the project. We disagree.

The July 2017 revised addendum was supported by a transportation impact analysis (TIA). The TIA included analysis of impacts of the project on the alley. This included: (1) an observation of existing alley operations, (2) an evaluation of existing alley conditions including width, (3) a calculation of peak hour level of service (LOS) for existing alley operations, (4) a calculation of future LOS for operations with and without the project, (5) an evaluation of service access and delivery operations, and (6) an analysis of access to the project's loading docks for a variety of trucks.

Based on the analysis in the addendum, the Department's decision concluded:

Project traffic will impact alley operations at the alley intersections with Stewart Street and Virginia Street. During the morning peak hour, the most noticeable impact will be at the alley/Virginia intersection, with a shift from LOS D to LOS F. During the afternoon peak hour, the alley/Virginia intersection will degrade from LOS E to F, and the alley/Stewart intersection will continue to operate at LOS F with an increase in delay of about eight seconds per vehicle. These impacts reflect increased delay for traffic on the alley; additional delay is not expected for traffic on Virginia and Stewart streets.

Queuing on the alley at its intersection with Virginia also will increase with project traffic. During the morning peak hour, the 95th percentile queue length is estimated to increase from 65' to 200', while in the afternoon peak hour, the 95th percentile queue length is estimated to increase from 60' to 155'. (The 95th percentile queue length represents the queue that would be exceeded only five percent of the

time, and serves as a reasonable worst-case queuing condition.) Queues on Virginia Street, Stewart Street, and the alley approaching Stewart Street would not noticeably change due to traffic from the project.

Project access is proposed from the alley on the west side of the site. The width of the alley varies between approximately 16' and 22'. In some parts of the alley, garbage containers constrain the alley to as narrow as 14'. With the development of the proposed project and a nearby project at 1903 5th Avenue, portions of the alley will be widened.

Loading and unloading activity in the alley currently block traffic. Observations over two days documented a range of delays, most of them under 25 minutes but one for over three hours. Some of the alley blockage was associated with the Icon Grill, which will be removed with the project. Delivery and loading for both the proposed project and the future development at 1903 5th Avenue would occur from access via the alley and could result in increased loading activity in the alley or potential short-term blockages. The proposed loading bays for both projects would accommodate the expected loading demand and truck lengths without blocking the alley, resulting in less long-term alley blockage. Loading docks at the project site are designed to accommodate an SU-30 vehicle. Turning templates demonstrate that two SU-30 vehicles could be accommodated side-by-side in the loading dock. In the occasional circumstance where a larger vehicle (such as a residential moving van) needs to access the site, they would be directed to obtain a street use permit from SDOT so that the truck could be parked on the adjacent street during move-in or move-out.

The hearing examiner also heard testimony from the Applicant and Escala's traffic experts as well as the City's. The hearing examiner concluded:

The Appellant has not demonstrated that the Department did not adequately analyze transportation impacts. The Applicant competed adequate analysis of project operations in the context of the alley. Much of the Appellant's expert's transportation analysis was based on the Applicant's analysis that was used to support the City's SEPA analysis. The City's SEPA analysis was adequate for determining if there would be any probable significant impacts, and this analysis and the conclusion that there would be no new transportation impacts other than those analyzed in the FEIS satisfies the rule of reason.

We agree with the hearing examiner that the analysis of traffic impacts to the alley satisfied the rule of reason and is adequate under SEPA.

### c. Light and Human Health

Escala next contends that the City's SEPA analysis failed to adequately address the impacts from loss of light and human health for Escala residents affected by the project. While Escala recognizes that the lighting addendum provided analysis of the health effects of the loss of light, its primary argument is that the analysis fails to consider the "worst case scenario." We disagree.

The SEPA rules define a process for addressing uncertainty. First, if there are "gaps in relevant information or scientific uncertainty concerning significant impacts, agencies shall make clear that such information is lacking or that substantial uncertainty exists." WAC 197-11-080(2). The SEPA rules next state than an agency may proceed in the absence of such information "[i]f information relevant to adverse impacts is important to the decision and the means to obtain it are speculative or not known." WAC 197-11-080(3). And finally, if the agency proceeds, "it shall generally indicate in the appropriate environmental documents its worst case analysis and the likelihood of occurrence, to the extent this information can reasonably be developed." WAC 197-11-080(3).

The Department followed this process. First, it disclosed that there was uncertainty. After reviewing the lighting studies, the Department explained: "[t]he studies note that there is not yet any empirical basis for understanding the effects of reduced daylight on human health, and the research of impacts of reduced light on

-21-

human health is inconclusive." It next generally explained why the studies submitted by

the applicant were a "worst case" analysis:

> The information provided by the applicant and identified in the Second EIS Addendum indicates that the reduction of light inside the Escala residential units is expected to be less than moderate and is not expected to be significantly adverse. As noted above, the information provided by the applicant indicates the project would result in a 25% reduction of instances of units reaching at least 150 EML. Each of the floors used in the Stantec study are the lowest floors in the building with that particular unit based on the Escala building permits provided to [the Department]. As indicated in the study and subsequent clarification from the applicant, the intent of the WELL Standard Analysis was to evaluate the condition with the maximum impact for each type of floor layout for Escala residential units. Further, the analysis looks at a 56% reduction in light in those regularly occupied eastern-facing units. Units facing north, south and west will not experience such reductions of light due to the project proposal. Therefore, the analysis looks at the units most impacted, or "worst case."

As for impacts of a reduction of lighting on health, the Department again

concluded that there was no consensus that there would be.

> Further, there is no clear consensus of health outcomes based on a reduction of light due to the proposed project. While [Escala's expert] concluded that long-term exposure to misalignment of lighting can be associated with higher incidence of cancer, cardiovascular disease, metabolic disorders and depression, such associations of higher incidences of a particular disease does not establish the project will result in likely significant adverse human health impacts to residents of Escala due to loss of light as a result of the project. As noted by the <u>Brainard Study</u>, published studies evaluating the impacts of daylight on human health are limited and "lack control of many variables that are known to elicit changes in circadian timing of human physiology such as exercise or activity levels, temperature, diet, previous light history or changes in photic conditions."

The Department's revised decision concluded:

> While the studies in the second Addendum measure the reduction of light into residential units of the Escala, there is a lack of scientific consensus to determine how this loss may directly impact human health, particularly where there are other variables at play unrelated to any proposed development. Any potential impacts of reduced lighting on human health would be expected to be reduced by use of electric lighting and by wakeful

hours spent outside of the home, since wakeful hours spent outside the home expose people to daylight conditions. Consequently, even in light of the public comments and reports by [Escala's experts], [the Department] concludes that the project's reduction of light into the Escala residential units does not result in probable significant impacts to human health.

The hearing examiner, after hearing two days of testimony, agreed with the Department that there was a lack of evidence of health impacts. The hearing examiner found:

> Regarding health impacts, Escala does not present evidence refuting there is not yet a scientific accepted metric to evaluate impacts of light on human health, or to distinguish health impacts between natural and electric light. No studies were submitted demonstrating an empirical relationship between daylight alone and health outcomes. Appellant's closing brief notes that "scientific studies documenting a specific dose response relationship [between light and health] do not exist." Studies [Escala's expert] referenced in comments cite to health-related impacts to shiftwork, a distinct condition involving overexposure to light at night. And, testimony on students getting up early and requiring additional sleep is a distinct situation from that presented in this appeal.

We agree with the hearing examiner. The City's SEPA analysis presents decisionmakers with a reasonably thorough analysis, including the impacts under the worst case scenario, of the impacts of the project's impacts on the health of Escala's residents.

The City's SEPA analysis, including its adoption of the Downtown EIS and Addenda was adequate.

B. Attorney Fees

The City of Seattle and Applicants[7] requests attorney fees on appeal. In this situation, we are without discretion to deny an award of attorney fees.

---

[7] The Applicants are Jodi–Patterson O'Hare; G4 Capital Seattle Holdings, LLC, 1921-27 Fifth Avenue Holdings 591683; and 1921-27 Fifth Avenue Holdings LLC. City of Seattle and the Applicants receive attorney fees under separate provisions of RCW 4.84.370.

-23-

Fees and costs for an appeal of a land use decision are determined by RCW 4.84.370:

> (1) Notwithstanding any other provisions of this chapter, reasonable attorneys' fees and costs shall be awarded to the prevailing party or substantially prevailing party on appeal before the court of appeals or the supreme court of a decision by a county, city, or town to issue, condition, or deny a development permit involving a site-specific rezone, zoning, plat, conditional use, variance, shoreline permit, building permit, site plan, or similar land use approval or decision.  The court shall award and determine the amount of reasonable attorneys' fees and costs under this section if:
> (a) The prevailing party on appeal was the prevailing party or substantially prevailing party before the county, city, or town, or in a decision involving a substantial development permit under chapter 90.58 RCW . . .; and
> (b) The prevailing party on appeal was the prevailing party or substantially prevailing party in all prior judicial proceedings.
> (2) In addition to the prevailing party under subsection (1) of this section, the county, city, or town whose decision is on appeal is considered a prevailing party if its decision is upheld at superior court and on appeal.

First, the Applicants were prevailing parties under RCW 4.48.370(1).  They prevailed in all forums below and are the prevailing parties on this appeal.  Moss v. City of Bellingham, 109 Wn. App. 6, 30, 31 P.3d 703 (2001).  The City of Seattle is likewise a prevailing party.  "Under [RCW 4.84.370] . . . we award fees to the public entity that made the permitting decision only when the public entity succeeds in defending its decision on the merits."  Durland v. San Juan County, 182 Wn.2d 55, 78, 340 P.3d 191 (2014).  Because the trial court upheld the City of Seattle's MUP decision, and because we uphold this decision as well, an award of attorney fees against Escala is mandatory.

Affirmed.

WE CONCUR:

Mann, J.

Bowman, J

Appelwick, J.P.T.