IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| ROSSI LARSON, LLC, a Washington limited liability company, MELISSA ROSSI and NICK ROSSI, | ) ) ) ) | No. 39614-2-III |
| Appellants, | ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| CHELAN COUNTY, BERGREN TREE FRUITS, LLC; CARNAN BERGREN; and DAN BEARDSLEE, | ) ) ) ) ) | |
| Respondents. | ) | |

COONEY, J. — In 2020, Bergren Tree Fruits, LLC (Bergren) through their agent/applicant, Dan Beardslee, applied to Chelan County (County) for a planned development and major subdivision located on approximately 42 acres of former orchard land owned by Bergren. Following a State Environmental Policy Act (SEPA)[1] review, a threshold determination was made and a mitigated determination of nonsignificance

---

[1] Chapter 43.21C RCW.

(MDNS) was issued. Nick and Melissa Rossi (Rossis), who own an orchard near the planned development, appealed the issuance of the MDNS. Following a multi-day hearing process, the hearing examiner conditionally approved the application and affirmed issuance of the MDNS.

The Rossis appeal the conditional approval of the application as well as the hearing examiner's affirmance of the MDNS. The Rossis argue that the hearing examiner's findings are inadequate for review, that the project does not comply with the Peshastin urban growth area comprehensive plan, that the hearing examiner's decision conditionally approving the application violates numerous Chelan County Code (CCC) provisions, and that the hearing examiner's affirmance of the MDNS violates SEPA. We disagree and affirm.

## BACKGROUND

In 2008, the County created the Peshastin Urban Growth Area (UGA) and adopted the Peshastin UGA Comprehensive Plan (Comprehensive Plan). The Comprehensive Plan incorporated various goals and policies from the Peshastin UGA related to housing, land use, zoning, and transportation, among other things.

Bergren owns approximately 42 acres of vacant land (Property) located within Peshastin's UGA and is zoned low density residential (R-1). The Property is located north of Derby Canyon Road along Larson Road in Peshastin, Washington. In 2020, Mr. Beardslee (Applicant) filed an application for a planned development and a major

subdivision to be located on the approximately 42 acres of land owned by Bergren. The application proposed 134 lots of residential development for detached single-family residences, accessory dwelling units (ADU), duplexes, and townhouses (the Project).

Included with the application, among other items, was a preliminary site plan and road plan, geological hazards report, narrative description, domestic water availability letter, sanitary sewer availability letter, a stormwater control plan authored by Torrence Engineering LLC, and a traffic impact study (TIS). The County recommended the Project be approved.

SEPA REVIEW

During the application phase, the Applicant submitted an environmental checklist to the County pursuant to the SEPA. The County received numerous comments from both the public and governmental agencies, including Chelan County Public Works, Chelan County Public Utility District No. 1 (PUD), Department of Ecology (Ecology), and the Washington State Department of Transportation (WSDOT), among others. The County considered the comments and completed an environmental review. Based on the threshold determination, a final MDNS was issued by the County's SEPA responsible official.

The application also included a TIS, authored by Michael Read, that analyzed the Project's impact on traffic and was subsequently revised. The WSDOT reviewed the

3

revised TIS and had no comments. Due to the resulting impacts on traffic under the revised TIS, conditions were incorporated into the MDNS to mitigate potential effects.

Additionally, soils on the property were tested and found to be contaminated due to past orchard operations. Ecology recommended that the model remedies for cleanup of former orchard properties in Central and Eastern Washington (Model Remedy) be used to clean up the site. Ecology also recommended that the Model Remedy developer agreement be used to "avoid placing the burden of cleanup on purchasers of vacant lots." Clerk's Papers (CP) at 943. Both of Ecology's recommendations were incorporated into the MDNS.

The MDNS also included other mitigating conditions related to domestic water service, sanitary sewer service, sewage disposal, stormwater drainage, and archaeological resources potentially present at the site of the Project.

SEPA APPEAL AND CONDITIONAL APPROVAL OF THE PROJECT

The Rossis filed an appeal of the MDNS. They contend that the Model Remedy was not adequate to mitigate the environmental impacts of the contaminated soils, that the conditions in the MDNS related to traffic impacts were not adequate, that the conditions in the MDNS were insufficient to eliminate the Project's adverse impacts on land use compatibility, that the MDNS did not properly mitigate risks to irrigation lines, and that the SEPA responsible official did not have sufficient information to make the SEPA determination.

4

The hearing examiner conducted a multi-day hearing process and took evidence from numerous expert and lay witnesses testifying for and against approval of the Project's application and the MDNS. Among the individuals who testified for the Rossis were: Nick Rossi; Pam Jenkins, an expert witness who testified regarding potential health impacts of the contaminated soils; Katie Saltanovitz, an expert witness who testified regarding stormwater and erosion; and Kassi Leingang, an expert witness who testified regarding traffic impacts.

In August and then September 2022, the hearing examiner issued: (1) findings of fact, conclusions of law, decision and conditions of approval conditionally approving the Project (Conditioned Approval), and (2) his decision on appeal of the SEPA determination for the Pine Ridge planned development, affirming the MDNS. The Rossis moved for reconsideration and the hearing examiner issued a decision on requests for reconsideration that made some minor corrections to the Conditioned Approval and his decision affirming the MDNS.

In the Conditioned Approval, the hearing examiner concluded the Application "demonstrate[d] consistency with the goals and policies set forth in the Chelan County Comprehensive Plan" and "as conditioned, is compatible with adjacent uses and would not harm or change the character of the surrounding area." CP at 773. The hearing examiner also issued 66 conditions of approval of the application.

In its decision on the SEPA appeal, the hearing examiner found the Rossis' claims related to impacts to irrigation lines were speculative, and the hearing examiner had enough information to issue the MDNS.

The hearing examiner found the Rossis' experts unconvincing. The hearing examiner found the "factual study and opinions by traffic expert, Michael Reed [sic] were more convincing that [sic] those opinions issued by Appellant's expert, Kassi Leingang." CP at 1627. The hearing examiner found "it significant that Ms. Leingang did not do any data collection regarding traffic counts on any roads, but instead based her understanding of traffic volumes on discussions with area residents and employees." CP at 64, 1627.

As to Ms. Jenkins, the hearing examiner found "her testimony and opinions were not convincing and . . . her purported opinions regarding health risks were not convincing." CP at 1627. Instead, Ms. Jenkins "simply disagreed with the Department of Ecology's proposal to mitigate soil contamination on the site [using the Model Remedy]." CP at 1627. Finally, as to Ms. Saltanovitz, the hearing examiner rejected her expert testimony stating "that the Applicant's stormwater plan was not adequate, [wa]s not more convincing that [sic] the report submitted by John Torrence." CP at 1627.

The hearing examiner concluded that the threshold determination was based on sufficient information and that it fully and fairly evaluated all known or probable environmental impacts. The MDNS was therefore affirmed.

No. 39614-2-III
*Rossi Larson LLC, et al. v. Chelan County, et al.*

The Rossis appeal pursuant to RCW 36.70C.150.[2]

ANALYSIS

I.     WHETHER THE HEARING EXAMINER ENTERED ADEQUATE FINDINGS OF FACT AND
       CONCLUSIONS OF LAW

The Rossis argue that the hearing examiner's findings of fact and conclusions of law on their appeal of the SEPA determination are inadequate to permit meaningful review.[3] They cite *Weyerhaeuser v. Pierce County*, 124 Wn.2d 26, 873 P.2d 498 (1994), and urge us to remand for proper findings, as the court did in *Weyerhaeuser*. Bergren and the County respond that the hearing examiner's findings and conclusions are detailed and sufficient for judicial review and are in stark contrast to those in *Weyerhaeuser*. We agree with Bergren and the County.

Findings of fact by an administrative agency are subject to the same requirements as those drawn by a trial court. *State ex rel. Bohon v. Dep't of Pub. Serv.*, 6 Wn.2d 676, 694, 108 P.2d 663 (1940); *State ex rel. Duvall v. City Council of City of Seattle*, 64 Wn.2d 598, 602, 392 P.2d 1003 (1964). "The purpose of findings of fact is to ensure that

---

[2] "The superior court may transfer the judicial review of a land use decision to the court of appeals upon finding that all parties have consented to the transfer to the court of appeals and agreed that the judicial review can occur based upon an existing record. Transfer of cases pursuant to this section does not require the filing of a motion for discretionary review with the court of appeals." RCW 36.70C.150(1).

[3] The Rossis, in their issues pertaining to the assignments of error, also challenge the findings and conclusions related to the Conditioned Approval. However, they provide no substantive argument related to the findings of the planned development's approval so that issue is not addressed.

7

the decisionmaker 'has dealt fully and properly with all the issues in the case before he [or she] decides it and so that the parties involved' and the appellate court 'may be fully informed as to the bases of his [or her] decision when it is made.'" *Weyerhaeuser*, 124 Wn.2d at 35 (alterations in original) (quoting *In re Det. of LaBelle*, 107 Wn.2d 196, 218-19, 728 P.2d 138 (1986). The process the decisionmaker used should be revealed by the findings of fact and conclusions of law. *Hayden v. City of Port Townsend*, 28 Wn. App. 192, 622 P.2d 1291 (1981). "Statements of the positions of the parties, and a summary of the evidence presented, with findings which consist of general conclusions drawn from an 'indefinite, uncertain, undeterminative narration of general conditions and events', are not adequate." *Weyerhaeuser*, 124 Wn.2d at 36 (citing *Bohon*, 6 Wn.2d at 695).

The Rossis cite *Weyerhaeuser* and contend that, like *Weyerhaeuser*, the hearing examiner here failed to issue adequate findings. We disagree.

In *Weyerhaeuser*, the Washington Supreme Court found the hearing examiner's decision upholding an environmental impact statement (EIS) inadequate because it failed to explain how it reached its conclusions. The court noted that the "bulk of the hearing examiner's decision documents consist[ed] of summarizing evidence presented, without any guidance as to how issues involving disputed evidence were resolved by the hearing examiner." *Id.* As an example, the court pointed to the issue of whether the proposal was public or private. The only finding on that issue was: "The proposal advanced by the

8

applicant is for a private project as defined by WAC 197-11-780." *Id.* The same exact sentence was then repeated as a conclusion of law. *Id.* The court ruled that "[t]he findings and conclusions [were] clearly inadequate to determine the basis for the hearing examiner's decision upholding the adequacy of the EIS." *Id.* "While a finding recites that the project is a private project, there is no clue as to the basis for that conclusion." *Id.*

Bergren points to *Citizens Alliance to Protect Our Wetlands v. City of Auburn*, decided a year after *Weyerhaeuser*, in which the Washington Supreme Court called *Weyerhaeuser* "an extreme case of noncompliance." 126 Wn.2d 356, 369, 894 P.2d 1300 (1995). The court in *Citizens* ruled that the hearing examiner's findings and conclusions were adequate where it "filed a single-spaced 10-page ruling with substantial analysis of every issue." *Id.* The court concluded that "[b]ecause a reviewing court can determine the basis for her decision, the hearing examiner's findings are sufficient." *Id.*

Here, unlike in *Weyerhaeuser*, the hearing examiner issued detailed findings and conclusions illustrating the basis for his decisions. The Rossis point specifically to the hearing examiner's finding's that Ms. Saltanovitz's and Ms. Jenkins' testimony was not convincing, and argue the hearing examiner did not adequately explain why. The Rossis' argument boils down to a disagreement with the hearing examiner's credibility determinations.

9

As to Ms. Saltanovitz, the hearing examiner found her expert testimony stating "that the Applicant's stormwater plan was not adequate, [wa]s not more convincing that [sic] the report submitted by John Torrence. Additionally, any erosion or sediment control plan will need to be approved by the Washington State Department of Ecology and meet statewide standards." CP at 1627. The Rossis argue that this finding is similar to the findings in *Weyerhaeuser* and does not permit adequate judicial review. The Rossis contend the hearing examiner dismissed Ms. Saltanovitz's testimony without explaining why. But the hearing examiner sufficiently explained why. The hearing examiner noted he found the report submitted by John Torrence more persuasive. Clearly this was a contested issue with conflicting evidence from both sides and this court must defer to the hearing examiner's credibility determinations. *City of Univ. Place v. McGuire*, 144 Wn.2d 640, 652-53, 30 P.3d 453 (2001). The Rossis may disagree with the hearing examiner's credibility determination but that does not render the finding inadequate.

As to Ms. Jenkins' testimony, the hearing examiner found

her testimony and opinions were not convincing and . . . her purported opinions regarding health risks were not convincing to the Hearing Examiner. She simply disagreed with the Department of Ecology's proposal to mitigate soil contamination on the site. However, the soil contamination on the site and the mitigation was fully considered by the SEPA responsible official.

CP at 1627. Again, the hearing examiner found Ecology's proposal more convincing and the Rossis disagree with that determination. However, the hearing examiner's finding illustrates the basis for his decision; he found Ecology's proposal more convincing and noted that Ms. Jenkins merely disagreed with it.

In the Appellants' statement of additional authorities, the Rossis cite *Regan v. Department of Licensing*[4] and *State v. C.J.*[5] to support their argument that, "[u]nless the credibility finding includes a statement of the basis for the credibility determination, it would be impossible for the reviewing court to determine whether there was substantial evidence to support the credibility determination." Appellant's Statement of Additional Auths. at 2. Neither case cited by the Rossis pronounce such an overt principle. In *Regan* we held, "We will not substitute our judgment on credibility of witnesses or the weight of conflicting evidence." 130 Wn. App. at 49. In *C.J.*, we addressed the trial court's "findings of fact regarding [the victim]'s competency at the time he made the hearsay statements . . . not support[ing] its legal conclusion that [the victim]'s hearsay statement should be admitted." 108 Wn. App. at 798.

Moreover, this case is unlike *Weyerhaeuser* which, as the court in *Citizens* noted, was "an extreme case of noncompliance." 126 Wn.2d at 369. Here, the hearing

---

[4] 130 Wn. App. 39, 121 P.3d 731 (2005).
[5] 108 Wn. App. 790, 798, 32 P.3d 1051 (2001), *rev'd on other grounds*, 148 Wn.2d 672, 63 P.3d 765 (2003).

examiner issued a 9-page single-spaced decision addressing all of the issues. To avoid having to address our deference to the hearing examiner's judgment on credibility of witnesses, the Rossis present their argument as an attack on the adequacy of his findings and conclusions. Consequently, their argument fails.

The hearing examiner made adequate findings of fact.

II.     WHETHER THE HEARING EXAMINER ERRED IN FINDING THE PROJECT COMPLIED
        WITH THE COMPREHENSIVE PLAN

The Rossis argue that the hearing examiner's determination that the Project complies with the Comprehensive Plan was an error of law. The Rossis contend the hearing examiner committed an error of law under RCW 36.70C.130(1)(b) when he failed to consider the agricultural and freight network provisions in the Comprehensive Plan. The Rossis further argue that the hearing examiner's findings that the Project is consistent with the Comprehensive Plan's residential policies D and F was not supported by substantial evidence. We disagree. The hearing examiner's determination that the Project complies with the Comprehensive Plan was not error.

In reviewing a land use decision, this court stands in the same position as the superior court and limits its review to the record created before the hearing examiner. *Phoenix Dev., Inc. v. City of Woodinville*, 171 Wn.2d 820, 828, 256 P.3d 1150 (2011); *Pinecrest Homeowners Ass'n v. Glen A. Cloninger & Assocs.*, 151 Wn.2d 279, 288, 87 P.3d 1176 (2004); RCW 36.70C.130.

No. 39614-2-III
*Rossi Larson LLC, et al. v. Chelan County, et al.*

"[The Land Use Petition Act (LUPA), chapter 36.70C RCW,] provides the exclusive means for judicial review of a land use decision (with the exception of those decisions separately subject to review by bodies such as the growth management hearings boards)." *Phoenix Dev.*, 171 Wn.2d at 828 (citing *Woods v. Kittitas County*, 162 Wn.2d 597, 610, 174 P.3d 25 (2007)). Under LUPA, this court may reverse the hearing examiner if the Rossis establish at least one of the six standards set forth in RCW 36.70C.130(1):

> (1) The superior court, acting without a jury, shall review the record and such supplemental evidence as is permitted under RCW 36.70C.120. The court may grant relief only if the party seeking relief has carried the burden of establishing that one of the standards set forth in (a) through (f) of this subsection has been met. The standards are:
>
> (a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;
>
> (b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;
>
> (c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;
>
> (d) The land use decision is a clearly erroneous application of the law to the facts;
>
> (e) The land use decision is outside the authority or jurisdiction of the body or officer making the decision; or
>
> (f) The land use decision violates the constitutional rights of the party seeking relief.

At issue here are standards (b) and (c).

RCW 36.70C.130(1)(b) does not require the court to give complete deference, but rather, "'such deference as is due.'" *Ellensburg Cement Prods., Inc. v. Kittitas County*,

13

179 Wn.2d 737, 753, 317 P.3d 1037 (2014)).  Whether the hearing examiner interpreted the law erroneously is a question of law this court reviews de novo.  *Lord v. Pierce County*, 166 Wn. App. 812, 818, 271 P.3d 944 (2012).

When reviewing a challenge to the sufficiency of the evidence under subsection (c), "we view facts and inferences in a light most favorable to the party that prevailed in the highest forum exercising fact-finding authority," in this case, Bergren.  *Phoenix Dev.*, 171 Wn.2d at 828-29.  "Under the substantial evidence standard, there must be a sufficient quantum of evidence in the record to persuade a reasonable person that the declared premise is true."  *Id.* at 829 (citing *Wenatchee Sportsmen Ass'n v. Chelan County*, 141 Wn.2d 169, 176, 4 P.3d 123 (2000)).

This court may affirm or reverse the land use decision currently under review or remand it for modification or further proceedings.  RCW 36.70C.140.  If the decision is remanded for modification or further proceedings, the court may make such an order as it finds necessary to preserve the interests of the parties pending further proceedings or action by the local jurisdiction.  *Id.* at 829.

"To the extent a comprehensive plan prohibits a use that the zoning code permits, the use is permitted."  *Cingular Wireless, LLC v. Thurston County*, 131 Wn. App. 756, 770, 129 P.3d 300 (2006).  However, where the zoning code itself expressly requires a proposed use comply with the comprehensive plan, the proposed use must satisfy both the zoning code and the comprehensive plan.  *Id.*  Under CCC 11.22.050(1), planned

developments (PD), and therefore the Project, must be consistent with the

Comprehensive Plan. CCC 11.22.050(1) ("The PD designation confirms the PD is

consistent with the purpose of and provisions for planned developments and the

comprehensive plan."); *see also* CCC 11.22.010(1) ("The purpose of this chapter is to

provide development regulations for the Peshastin community that are consistent with,

and implement, the Peshastin sub-area comprehensive plan.").

A.  WHETHER THE HEARING EXAMINER FAILED TO CONSIDER THE
    AGRICULTURAL AND FREIGHT NETWORK PROVISIONS OF THE
    COMPREHENSIVE PLAN[6]

The Rossis argue that the hearing examiner committed an error of law under

RCW 36.70C.130(1)(b) when he allegedly failed to consider critical agricultural and

freight network policies in finding that the Project complied with the Comprehensive

Plan. Though the Rossis make the argument that the hearing examiner erroneously

interpreted the law, they do not explain what law the hearing examiner interpreted, let

alone how it was erroneous under RCW 36.70C.130(1)(b) ("The land use decision is an

erroneous interpretation of the law, after allowing for such deference as is due the

---

[6] In their opening brief, the Rossis do not specifically cite to the RCW 36.70C.130(1) standard they argue applies. Subsection (d) seemed like the most logical standard based on the Rossis' argument; however, in their reply the Rossis specifically state they are contending the "examiner committed an error of law under RCW 36.70C.130(1)(b)." Reply Br. of Appellants at 16. RCW 36.70C.130(1)(b) is not applicable because the Rossis do not point to any interpretation of law the hearing examiner made.

construction of a law by a local jurisdiction with expertise."). In fact, the Rossis fail to point to any interpretation of law that the hearing examiner made regarding this issue. Thus, the Rossis' argument fails.

Under CCC 11.22.050(1), the Project must be consistent with the Comprehensive Plan. As the Rossis correctly note in their reply, none of the parties dispute this requirement. Reply Br. of Appellants at 17. The Rossis allege the hearing examiner failed to consider certain parts of the Comprehensive Plan in finding that the Project complied with it. Bergren responds that the Project is consistent with numerous statements and goals outlined in the Comprehensive Plan. The County points out that many of the Comprehensive Plan's goals and policies conflict with one another since the Comprehensive Plan encourages agriculture while also emphasizing expanding housing in Peshastin's UGA.

Absent from the Rossis' argument is any reference to what law the hearing examiner interpreted erroneously. Indeed, the hearing examiner did not interpret any law when he found that the Project complied with the Comprehensive Plan, he simply applied the law to the facts. Thus, the Rossis could potentially challenge the hearing examiner's determination under subsection (d) of RCW 36.70C.130(1), but they specifically cite to subsection (b). Because the Rossis cannot show the hearing examiner erroneously interpreted any law when he found that the Project complied with the Comprehensive Plan, their argument fails. *See also State v. Stubbs*, 144 Wn. App. 644, 652, 184 P.3d 660

(2008) ("Passing treatment of an issue *or lack of reasoned argument* is insufficient to allow for our meaningful review." (Emphasis added.)), *rev'd on other grounds by* 170 Wn.2d 117, 240 P.3d 143 (2010).

> B.  WHETHER THE HEARING EXAMINER'S DETERMINATION THAT THE PROJECT COMPLIED WITH THE COMPREHENSIVE PLAN IS SUPPORTED BY SUBSTANTIAL EVIDENCE

The Rossis argue that the hearing examiner's finding that the Project complies with the Comprehensive Plan's residential policies D and F is not supported by substantial evidence under RCW 36.70C.130(1)(c). We disagree.

> 1. POLICY D

The Rossis contend the finding that the Project complies with residential policy D is not supported by substantial evidence because the Project is not compatible with the adjacent residential development. The Rossis argue that the adjacent properties are large orchards with single homes on significant acreage while the Project would have a much higher allowed density. The County responds that there is only so much land in Peshastin and residential areas frequently abut agricultural areas. Further, the County contends that because the Project is located in the Peshastin UGA, the Chelan County Board of Commissioners has already determined that the site of the Project is suitable for development. We agree with the County. The hearing examiner's finding that the Project complies with Comprehensive Plan policy D is supported by substantial evidence.

17

The Comprehensive Plan's residential policy D reads: "POLICY D: Determine the density of development which is compatible with adjacent residential development." CP at 757; Br. of Resp't Chelan County App. A-026. The rationale for this policy is:

> Urban densities should be determined by services available, the road network, and adjacent land uses. Where a full range of urban utilities are available and adjacent land uses dictate a need for buffering. Adjacent to existing, well-established neighborhoods, lower densities should be reflected, such as four units per acre. Several different zoning classifications should be developed to allow for properly adjusted densities and mixed-use development.

CP at 757; Br. of Resp't Chelan County App. A-026.

As the County correctly notes, Washington law encourages growth in UGAs. RCW 36.70A.110(1) states, "Each county that is required or chooses to plan under RCW 36.70A.040 shall designate an urban growth area or areas *within which urban growth shall be encouraged* and outside of which growth can occur only if it is not urban in nature." (Emphasis added.) The Rossis do not dispute that the Project lies within Peshastin's UGA. Because the Project is located in the Peshastin UGA, it has already been determined that the site of the Project is appropriate for urban growth and is compatible with adjacent land uses.

The hearing examiner's finding that the Project complies with the Comprehensive Plan's residential policy D, and therefore, the Comprehensive Plan, is supported by substantial evidence.

18

2. POLICY F

The Rossis contend the hearing examiner's finding that the Project complies with the Comprehensive Plan's residential policy F is not supported by substantial evidence.

The Comprehensive Plan's residential policy F reads: "POLICY F: Encourage residential growth to occur in areas where public utilities exist or may be provided at reasonable costs." CP at 757; Br. of Resp't Chelan County App. A-027. The rationale for this policy is "[p]romoting developments in or close to areas with existing public utilities save not only possible future public expenditures, but should lower the initial cost of development, thereby providing more reasonably priced housing." CP at 757; Br. of Resp't Chelan County App. A-027.

Bergren points out that the Chelan County PUD No. 1 commented that, though improvements would be needed to the existing wastewater systems in order to accommodate development, services could be made available. The Peshastin Water District also provided a certificate of water availability for the Project. The hearing examiner noted this in its findings of fact. The Rossis argue that currently there are not adequate sewer services to serve the Project. Although correct, the Chelan County PUD No. 1 noted that adequate sewer services could be made available. Policy F "encourage[s] residential growth to occur in areas where public utilities exist or *may be provided.*" CP at 757 (emphasis added). The substantial evidence in the record shows that utilities could be provided to the project.

The hearing examiner's finding that the Project complies with the Comprehensive Plan's residential policy F, and therefore, the Comprehensive Plan, is supported by substantial evidence.

III.     WHETHER THE HEARING EXAMINER ERRED IN FINDING THAT THE PROJECT COMPLIED WITH VARIOUS PROVISIONS OF THE CHELAN COUNTY CODE

The Rossis argue that the hearing examiner's decision to conditionally approve the Project was error because the Project does not comply with various CCC provisions, namely CCC 14.98.525, 11.22.050(6), 10.30.010, 11.22.040, 11.22.050(3)(C), and 12.04.020(1)(E).  The Rossis contend the hearing examiner's decision was erroneous under RCW 36.70C.130(1)(b), (c) and (d).  We disagree.

RCW 36.70C.130(1)(b) does not require the reviewing court to give complete deference to a local jurisdiction with expertise, but rather, "'such deference as is due.'" *Ellensburg Cement Prods*, 179 Wn.2d at 753.  Under RCW 36.70C.130(1)(d), we review whether the land use decision is a clearly erroneous application of the law to the facts de novo.  *Lord*, 166 Wn. App. at 818.  A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the "definite and firm conviction that a mistake has been committed."  *Phoenix Dev.*, 171 Wn.2d at 829.

When reviewing a challenge to the sufficiency of the evidence under RCW 36.70C.130(1)(c), "[w]e view facts and inferences in a light most favorable to the party that prevailed in the highest forum exercising fact-finding authority," in this case,

20

Bergren and the County. *Phoenix Dev.*, 171 Wn.2d at 828-29. "Under the substantial evidence standard, there must be a sufficient quantum of evidence in the record to persuade a reasonable person that the declared premise is true." *Id.* at 829 (citing *Wenatchee Sportsmen Ass'n*, 141 Wn.2d at 176).

A.  DENSITY CALCULATION (CCC 14.98.525)

The Rossis contend the hearing examiner incorrectly interpreted the density code section and misapplied the law to facts in finding that the Project's density was 3.18 dwelling units per acre. RCW 36.70C.130(1)(b) ("The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise."), (d) ("The land use decision is a clearly erroneous application of the law to the facts."). The County points out that the Applicant was not required to state how many dwelling units would be on each lot at this stage and it was therefore reasonable for him to calculate density by dividing the number acres by the number of lots. We agree with the County.

The Comprehensive Plan states the density for R-1 is 4 units per acre. On the other hand, the zoning code states that the maximum density for R-1 is 5 dwelling units per acre for single-family residences and 10 units per acre for duplexes. CCC 11.22.020(1)(A). Because the CCC requires that PDs, such as the Project, comply with the Comprehensive Plan, the applicable density is 4 units per acre. *Cingular Wireless*, 131 Wn. App. at 770; CCC 11.22.050(1); *see also* CCC 11.22.010(1) ("The purpose of

21

this chapter is to provide development regulations for the Peshastin community that are consistent with, and implement, the Peshastin sub-area comprehensive plan.").

The application for the Project stated it consisted of a 42.1-acre property divided into 134 lots. The application also stated that the planned development would include ADUs, duplexes, single family residences, and zero lot line townhomes. The hearing examiner found that the Project's density is 3.18 dwelling units per acre. The hearing examiner reached this finding by dividing 134 (the number of lots in the Project) by 42.1 (the number of acres in the Project).

The Rossis argue that, because the Project includes duplexes and ADUs, the correct density calculation is actually double what the hearing examiner found. The CCC defines density as the "number of dwelling units per unit of land." CCC 14.98.525. A "dwelling unit" is "one or more rooms designed, occupied or intended for occupancy as a separate living quarters with sleeping, sanitary facilities and kitchen facilities provided within the dwelling unit for the exclusive use of a single household." CCC 14.98.625. An ADU is one dwelling unit while a duplex is two dwelling units. CCC 14.98.050; 14.98.605. One ADU is permitted per lot with a single-family home. CCC 11.88.200.

The Rossis correctly point out that if each lot contained either a single-family home with an ADU, or a duplex, there would actually be 268 dwelling units on 42.1 acres of land for a density calculation of 6.38 units per acre. This is more than the Comprehensive Plan allows for an R-1 zoned planned development.

22

However, the County responds that there is no requirement that the Applicant state what use (single-family residence, ADU, duplex, etc.) will be on each individual lot at this stage. Instead, the hearing examiner made the reasonable assumption there would be at least one dwelling unit per lot and concluded this complied with CCC 11.22.050. The County further argues that when the time comes for final permitting for dwellings, the density limits could not be ignored and the County can and should deny the applications if density limits were to be exceeded. We agree with the County.

The Rossis speculate that each and every lot will have two dwelling units but this information was not before the hearing examiner. All the hearing examiner knew was that there were 134 lots on 42.1 acres. Thus, it was reasonable for him to calculate density by dividing 134 by 42.1. Further, the hearing examiner's density calculation of 3.18 dwelling units per acre was well within the Comprehensive Plan's allowed density of four dwelling units per acre for R-1. When the time comes for final permitting for dwellings, the County can and should deny the applications if the Comprehensive Plan's density limit is exceeded.

The hearing examiner's decision was not a clearly erroneous application of the law to the facts. RCW 36.70C.130(1)(d). Further, it was not an erroneous interpretation of the law when the hearing examiner interpreted CCC 14.98.525 as being calculated by dividing the number of lots by the number of acres in the Project because the type and

number of dwelling units per lot was not known to him at this stage.  RCW

36.70C.130(1)(b).

      B.     INFORMATION ABOUT THE PROJECT'S LAYOUT AND DESIGN
              (CCC 11.22.050(6))

The Rossis argue that the hearing examiner committed an error of law, presumably

under RCW 36.70C.130(1)(b),[7] in concluding that CCC 11.22.050(6) did not apply to the

Project and that the information outlined therein was not required to be included in the

application.  The Rossis contend the CCC requires that a subdivision application

accompany a single-family planned development application and that certain information

be included in that application.  Bergren responds that a subdivision application,

including the elements listed in CCC 11.22.050(6)(A)-(G), is not required until Bergren

applies for final plat approval for the Project.  We agree with Bergren.

CCC 11.22.050(6) states:

(6) Binding Site Plan or Subdivision.  A binding site plan is required for all
multifamily [Planned Development]s or a subdivision is required for single-
family lot [Planned Development]s and shall include the following:

     (A) All information required on a preliminary plat;

     (B) The location of all existing and proposed structures;

     (C) A detailed landscape plan indicating the location of existing
vegetation to be retained, location of vegetation landscaping structures to
be installed, the type of vegetation by common name and/or taxonomic
designation, the installed and mature height of all vegetation;

---

[7] The Rossis again do not cite the exact LUPA standard of review they contend
applies.

24

(D) Schematic plans and elevations of proposed building(s) with samples of all exterior finish material and colors, the type and location of all exterior lighting, signs and accessory structures;

(E) Utility, street and stormwater drainage plans that indicate the facilities, lay-out and capacities necessary to serve the entire [Planned Development];

(F) Inscriptions or attachments setting forth the limitations and conditions of development; and

(G) The provisions ensuring the development will be in conformance with the site plan.

The hearing examiner listed the requirements of CCC 11.22.050(6)(A)-(G) and then found:

[The] proposed Planned Development meets the zoning minimum of 5 dwelling units per acre. The proposal contains a 134-lot residential development on 42.1 acres (3.18 dwelling units per acre) as shown on the updated site plan. *The applicant is not pursuing any density increases, therefore none these items need to be met.*

CP at 764 (Finding of Fact (FF) 43.4.7.6.9) (emphasis added).

Preliminarily, it is unclear why the fact that Bergren is not seeking a density increase impacts the need to include the items listed in CCC 11.22.050(6)(A)-(G) in Bergren's Project application. Indeed, Bergren points out its Application was for both a major subdivision and a planned development, but Bergren does not dispute it did not include the information required in CCC 11.22.050(6)(A)-(G).

However, the Applicant stated that a subdivision would be pursued during final platting for each phase of the Project. The Rossis do not cite any authority requiring a subdivision be included *with* an application for a planned development. Indeed,

25

CCC 11.22.050(6) does not require a subdivision be included with a planned development application.

Given these facts, the Rossis have not demonstrated that the hearing examiner erroneously interpreted the law under RCW 36.70C.130(1)(b) when he found that Bergren need not include the items listed in CCC 11.22.050(6)(A)-(G). When Bergren seeks final plat approval for each phase, a subdivision will be required.

C. REVIEW BY THE AGRICULTURAL REVIEW COMMITTEE (CCC 10.30.010)

The Rossis argue that the hearing examiner committed an error of law (under RCW 36.70C.130(1)(b)) in his decision on appeal of SEPA determination when he found that review of the Application by the agricultural review committee (ARC) was not required. Bergren and the County respond that the ARC does not exist and so review of the application by it was impossible. The Rossis contend the hearing examiner's finding that the ARC does not exist is not supported by substantial evidence in the record. RCW 36.70C.130(1)(c). We agree with Bergren and the County.

CCC 10.30.010 states: "The primary goal of the ARC would be to *review proposed development*, identify potential affects [sic] on surrounding agriculture (impacts), and make recommendations for mitigation of impacts." (Emphasis added.) The hearing examiner found in his decision on appeal of SEPA determination that "Chelan County has not fully implemented the Agricultural Review Committee." CP at 1628.

26

As a threshold issue, the Rossis argue that the hearing examiner's finding that the ARC is not fully implemented is not supported by substantial evidence. The Rossis are incorrect. Mr. Beardslee testified during the SEPA appeal hearing that Chelan County did not have an ARC, and he had never seen one convened. The Rossis did not point to any testimony in the record disputing the fact that the ARC did not exist. Thus, the hearing examiner's finding is supported by substantial evidence.

The Rossi's primary argument is that the hearing examiner erroneously interpreted the law when he did not require review of the application by the ARC. Bergren and the County concede the application was not reviewed by the ARC but argue that it would have been impossible for the ARC to review the application since the committee did not exist. It would be futile to require Bergren's application be reviewed by the ARC when none existed. If we were to require the nonexistent ARC to review Bergren's application, or any other application, they could never be approved. Thus, the hearing examiner did not erroneously interpret the law or otherwise err by declining to require review of Bergren's application by the ARC.

D. 100-FOOT SETBACK (CCC 11.22.040)

The Rossis argue that the hearing examiner erroneously interpreted the law under RCW 36.70C.130(1)(b) when he determined that the 100-foot setback in CCC 11.22.040 was not required. Bergren responds that the hearing examiner did not err because the

100-foot setback does not apply to existing agricultural activities, but instead only applies to properties zoned commercial agriculture (AC). We agree with Bergren.

CCC 11.22.040(1) n.6 states that "[s]etbacks may be modified consistent with Section 11.88.040. Structures located adjacent to existing commercial agricultural activities will be required to have a one-hundred-foot setback, except when a waiver is recorded in accordance with Chapter 11.30." The hearing examiner, in his findings and conclusions, discussed CCC 11.22.040 and its setback requirements but did not discuss nor require a 100-foot setback.

Bergren points out that CCC 11.88.040(8), referenced in CCC 11.22.040(1) n.6, states, "No dwelling unit adjacent to the *commercial agricultural zoning district* shall be placed within one hundred feet of a property line, including those across a right-of-way." (Emphasis added.) Additionally, chapter 11.30, also referenced in CCC 11.22.040(1) n.6, is Chelan County's AC zoning chapter. Finally, CCC 11.22.040(1) n.6 states that structures located adjacent to "existing *commercial agricultural* activities" are required to have a 100-foot setback. (Emphasis added.) The code is clear—the 100-foot setback referenced in CCC 11.88.040(8) is only applicable to properties zoned AC. Because none of the properties adjacent to the Project are zoned AC, a 100-foot setback was not required and the hearing examiner did not erroneously interpret the law.

The Rossis argue that if we were to read the code as only requiring a 100-foot setback for properties zoned AC, CCC 11.88.040(8) would be a nullity because chapter

11.22 applies only to the Peshastin UGA and there are no AC zoning districts in the UGA. The Rossis' argument is unpersuasive. Though there are no AC zoning districts within the Peshastin UGA, a portion of the Peshastin UGA borders land zoned AC. Thus, CCC 11.88.040(8) is not a nullity. If the land in the Peshatin UGA that borders land zoned AC was developed, it would potentially require a 100-foot setback.

    E. OPEN SPACE REQUIREMENT (CCC 11.22.050(3)(C))

The Rossis argue that the hearing examiner's decision was both not supported by substantial evidence and was clearly erroneous when he found that the open space criteria applicable to the Project were met. RCW 36.70C.130(1)(c), (d).[8] Bergren responds that the hearing examiner's determination that the open space requirements applicable to the Project were met was not error. We agree with Bergren.

CCC 11.22.050(3)(C) states:

> The overall area within a PD that is required to be devoted to critical areas, on-site recreation and/or open space shall be no less than six hundred square feet per residential unit, and in no case shall there be less than ten percent of the overall development devoted to these areas.

---

[8] The Rossis also argue that the hearing examiner erroneously interpreted the code but, again, they do not point to any code interpretation that the hearing examiner made. Instead, the Rossis seem to only argue that the hearing examiner's finding was erroneous and not supported by substantial evidence.

Further, the code requires that at least 10,000 square feet or 60 percent of the open space, whichever is greater, be concentrated in contiguous usable areas (CCC 11.22.050(3)(B)(i)), that a minimum of 60 percent of the open space must be concentrated or connected into large usable areas (CCC 11.22.050(14)(C)), and that the open space be reasonably level with no slopes greater than 15 percent. (CCC 11.22.050(14)(E)).

The hearing examiner found that the Project exceeded the open space design requirements of the CCC. The hearing examiner also conditioned approval upon the Applicant submitting "[a] final landscaping plan demonstrating conformance with On-Site Recreation and/or Open Space Design Requirements" during the final platting for each phase of the planned development. CP at 775.

The Rossis argue that the Project does not meet the open space requirements of the CCC. Namely, they argue that the open space is broken up into isolated tracts, that the largest continuous tract is only 42.5 percent of the total open space, and that the slopes in some areas far exceed 15 percent. Thus, they argue that the hearing examiner's finding that the Project meets the open space requirements is not supported by substantial evidence and was an erroneous application of the law to the facts.

Bergren correctly points out that the Project complies with the code's open space requirements. The Project set aside 6.1 acres[9] of open space, which is more than 10 percent of the total 42.1-acre property. Further, County staff testified that the open space was continuous because there are trail connections that the code expressly allows. CCC 11.22.050(3)(B)(i) ("*The on-site recreation may include a combination of natural areas, parks, landscaped areas, trails*, and/or visual corridors; provided, that a minimum of ten thousand square feet or sixty percent of the on-site recreation, whichever is greater, is contiguous usable space." (Emphasis added.)); CCC 11.22.050(14)(C) ("A minimum of sixty percent of the on-site recreation or open space shall be concentrated *and/or connected* into large usable areas." (Emphasis added.)). Because the open space is connected via trail systems, CCC 11.22.050(14)(C) and CCC 11.22.050(3)(B)(i) are satisfied.

Finally, as to CCC 11.22.050(14)(C) and (E), Bergren points out that the Conditioned Approval requires these code sections be complied with and the hearing examiner explicitly referenced the code language in its findings. Though the slopes may

---

[9] Bergren and the Rossis repeatedly state the Project set aside 4.3 acres of open space. However, the findings reflect that the Applicant set aside 6.1 acres of open space. CP at 767 (FF 43.4.7.14.6). FF 43.4.7.14.6 also states that the property is 42.9 acres instead of 42.1. Regardless, 4.3 acres of open space would be more than 10 percent of the property even if the property is actually 42.9 acres, and 6.1 acres of open space is well over the 10 percent requirement.

31

be greater than 15 percent now, they may be graded and leveled later and the hearing examiner made this a condition of approval.

Thus, the hearing examiner's finding that the Project complies with the code's open space requirements is supported by substantial evidence and the hearing examiner's decision was not clearly erroneous.

F.  APPROPRIATE WATER, SEWER, AND OTHER UTILITIES FOR PROJECT
(CCC 12.04.020(1)(E))

The Rossis argue that the hearing examiner's finding that the Project complies with CCC 12.04.020(1)(E) is not supported by substantial evidence and is a misapplication of the law to the facts.  RCW 36.70C.130(1)(c), (d).  As a threshold matter, this argument is raised for the first time on reply and we may decline to address it. *In re Marriage of Bernard*, 165 Wn.2d 895, 908, 204 P.3d 907 (2009).  Nevertheless, in exercising our discretion, the issue is addressed below.

CCC 12.04.020(1)(E) states:

Each proposed land division shall be reviewed to ensure that:

. . . .

. . . Appropriate water, sewer and other utility provider(s) can approve potable water, sewer system, and other facilities necessary for each lot created by the division of land except where the open space tract, agricultural tract, conservation easements, or other non-buildable tracts are exempt from this requirement when noted on the plat that this 'tract(s) may not be suitable for development.'

The hearing examiner found that "[a]s submitted, the proposed major subdivision is consistent with the provisions of [CCC 12.04.020.]" CP at 770 (FF 45).

As previously noted, Chelan County PUD No. 1 commented that, though improvements would be needed to the existing wastewater systems in order to accommodate development, services could be made available. The Peshastin Water District also provided a certificate of water availability for the Project. The hearing examiner noted this in its findings of fact. The hearing examiner also conditioned approval on adequate utilities being provided to the Project. CP at 756 ("The applicant will be responsible for improving the local water and wastewater infrastructure as a condition of approval."). The Rossis argue that currently there are not adequate utilities to serve the Project. Although this may be accurate, the code does not require that utilities be *presently* available. It only requires that utility providers be able to approve the facilities necessary for each lot. Chelan County PUD No. 1 and the Peshastin Water District stated that they could and the hearing examiner required that the Applicant improve utilities as a condition of approval.

Thus, the hearing examiner's finding that the Project is consistent with CCC 12.04.020 is supported by substantial evidence and was not a misapplication of the law to the facts.

IV.  WHETHER THE HEARING EXAMINER'S DECISION UPHOLDING THE MDNS
     WAS ERROR

The Rossis argue that the hearing examiner's decision upholding the MDNS

violates SEPA for a multitude of reasons.  The Rossis contend the hearing examiner

incorrectly found that the County had adequate information to make a threshold

determination because the Project's effect on stormwater, erodible soils, and

contamination result in environmental hazards that have not been analyzed.  They also

argue that the application of Ecology's Model Remedy to remediate contamination

results in significant health risks, that land use conflicts between residential and

agricultural uses were not addressed, that traffic impacts were not addressed, and that

impacts to irrigation were not considered.  The Rossis further posit that because

significant impacts result from the Project, an EIS should have been required.

Bergren and the County respond that the County considered substantial

information that was sufficient to evaluate the Project's environmental impact and to

issue a threshold determination.  They contend any environmental impacts of the Project

were adequately addressed and mitigated by the MDNS.  We agree with Bergren and the

County.

SEPA is our legislature's pronouncement of Washington's environmental policy.

*Stempel v. Dep't of Water Res.*, 82 Wn.2d 109, 117, 508 P.2d 166 (1973).  SEPA

recognizes "the necessary harmony between humans and the environment in order to

prevent and eliminate damage to the environment and biosphere, as well as to promote the welfare of humans and the understanding of our ecological systems." *Id.* SEPA requires that environmental values and amenities are given appropriate consideration, along with economic and technical considerations, in decision making. RCW 43.21C.030(2)(c). Thus, SEPA requires that an EIS be prepared for "major actions significantly affecting the quality of the environment." *Id.* Our Supreme Court has not defined the term "significantly affecting," instead stating that "the procedural requirements of SEPA, which are merely designed to provide full environmental information, should be invoked whenever more than a moderate effect on the quality of the environment is a reasonable probability." *Norway Hill Preserv. & Prot. Ass'n v. King County Council*, 87 Wn.2d 267, 278, 552 P.2d 674 (1976).

SEPA requires evaluation of a proposal's environmental impact by examining two relevant factors: "(1) the extent to which the action will cause adverse environmental effects in excess of those created by existing uses in the area, and (2) the absolute quantitative adverse environmental effects of the action itself, including the cumulative harm that results from its contribution to existing adverse conditions or uses in the affected area." *Id*. at 277.

Before a local government processes a permit application for a private land use project, the agency conducts a threshold process in order to determine whether an action qualifies as a "major action[ ] significantly affecting the quality of the environment."

RCW 43.21C.030(2)(c).  "In order to facilitate the 'threshold determination,' the applicant must prepare an environmental checklist, which must provide information reasonably sufficient to evaluate the environmental impact of the proposal."  *Anderson v. Pierce County*, 86 Wn. App. 290, 301, 936 P.2d 432 (1997) (citing WAC 197-11-315 to -335).  If the environmental checklist does not contain enough information to make a threshold determination, the applicant may be required to submit additional information.  WAC 197-11-335(1).  The agency must consider mitigation measures that the applicant will implement and any such measures required by regulations, comprehensive plans, or other environmental laws.  WAC 197-11-330(1)(c).

Following the threshold phase, the agency issues one of three determinations: a determination of nonsignificance, an MDNS, or a determination of significance (DS).  WAC 197-11-340 to -350.  An EIS is mandatory following issuance of a DS.  RCW 43.21C.030(2)(c); WAC 197-11-440(5).  Under the MDNS process, an applicant can avoid EIS preparation by clarifying, changing, or conditioning the project to mitigate its significant adverse environmental impacts.  WAC 197-11-350(3).  But, if, even with mitigation measures, the project continues to have significant environmental impacts, an EIS must be prepared.  WAC 197-11-350(2).

"A threshold determination that an EIS is not required is reviewed under the 'clearly erroneous' standard."  *Chuckanut Conservancy v. Dep't of Nat. Res.*, 156 Wn. App. 274, 286, 232 P.3d 1154 (2010) (quoting *Norway Hill*, 87 Wn.2d at 273);

36

RCW 36.70C.130(1)(d). This court will overturn an MDNS only when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Norway Hill*, 87 Wn.2d at 274. "The scope of review is broad and the search for significant environmental impacts must be considered in light of the public policy of SEPA." *Chuckanut Conservancy*, 156 Wn. App. at 286 (citing *Sisley v. San Juan County*, 89 Wn.2d 78, 84, 569 P.2d 712 (1977)).

The agency's threshold determination is afforded deference but the agency must make a showing that environmental factors were considered in a manner amounting to a prima facie showing of compliance with the procedural requirements of SEPA. RCW 43.21C.090; *Chuckanut Conservancy*, 156 Wn. App. at 286-87. An agency's decision to issue an MDNS and not to require an EIS is afforded substantial weight. *Moss v. City of Bellingham*, 109 Wn. App. 6, 13-14, 31 P.3d 703 (2001).

The Rossis argue that the hearing examiner's decision affirming the MDNS violates SEPA. We disagree.

A.  STORMWATER, ERODIBLE SOILS, AND SOIL CONTAMINATION

The Rossis argue that the Project's stormwater, erodible soils, soil contamination, and resulting health risks have not been adequately analyzed. Bergren responds that the County used Ecology's Model Remedy and additional mitigation conditions to overcome concerns about lead arsenic contamination and that the County had sufficient information on this point to make a threshold determination. We agree with Bergren.

The County had adequate information related to the environmental hazards posed by stormwater runoff, erodible soils, and soil contamination to make a threshold determination and issue an MDNS. As to soil contamination, the County considered the comment letter from Ecology and implemented Ecology's recommendations regarding soil contamination.

As to stormwater, the MDNS stated that "[p]ermit coverage and erosion control measures must be in place prior to any clearing, grading, or construction." CP at 1387. This was consistent with another comment letter from Ecology stating that it recommended a national pollution discharge elimination system construction stormwater general permit that requires a stormwater pollution prevention plan be prepared and implemented for all construction sites. Finally, as to erodible soils, the MDNS stated that "[d]ust control shall be maintained during any earth disturbing activities during construction and installation." CP at 1387.

The Rossis also seem to argue that the hearing examiner's conclusion on appeal of the SEPA determination—that "the threshold determination in this matter is based upon sufficient information contained within the SEPA checklist, or later developed by the responsible agency, and it fully and fairly evaluates all known or probable environmental impacts"—is not supported by substantial evidence. CP at 1629. We disagree.

The Rossis' argument is primarily that their expert, Ms. Saltanovitz, disagreed with the MDNS's conditions and argued they were inadequate to properly mitigate the

Project's impacts. She testified that there were many issues with the Project's plan to contain and control stormwater. The Rossis point again to Ms. Saltanovitz's testimony regarding stormwater and argue that the hearing examiner erred when it found her testimony "not . . . convincing." CP at 1627. Again, the hearing examiner made a credibility determination that we will not disturb on appeal.

As to the erodible soils and soil contamination, the Rossis again point to Ms. Saltanovitz's testimony on these points. Ms. Saltanovitz testified she did not see disclosure of erosive soils and their potential impacts in the environmental checklist or the County's SEPA documents. However, the MDNS Conditioned Approval on a toxic cleanup plan approved by Ecology and the Project meeting the standards of the Model Toxics Control Act, chapters 70A.305, 82.21 RCW, prior to occupancy. This comports with Ecology's recommendation that "Chelan County implement [cleanup of the Project prior to occupancy] through Conditions of Approval." CP at 1586.

In issuing the MDNS, the County considered and implemented Ecology's comments regarding soil contamination and cleanup. The SEPA responsible official had sufficient facts and information, provided primarily by Ecology, to assess the impacts of stormwater, and erodible and contaminated soils and issue an MDNS. Further, the hearing examiner's conclusion that there was sufficient information to make a threshold determination is supported by substantial evidence.

B.  APPLICATION OF ECOLOGY'S MODEL REMEDY TO REMEDIATE
    CONTAMINATION

The Rossis argue that the application of Ecology's Model Remedy for orchard cleanup was not sufficient to remediate the contamination of the site of the Project. We disagree.

The Rossis simply disagree that the Model Remedy is the proper method of cleanup. They take issue with the way the Model Remedy seeks to clean up the Project site. The Rossis contend that cleanup will be piecemeal and that, therefore, the first purchasers of homes will have the worst health impacts as dirt and dust is disturbed to build new homes in subsequent phases. They also contend the Model Remedy and the model remedy developer agreement do indeed push cleanup responsibility on to homeowners even though the MDNS states that they do not.

The Rossis' first argument, that the Model Remedy calls for piecemeal cleanup of the site, does not appear to be supported by the record. The MDNS states that "*Ecology requires cleanup of this project prior to occupancy. Cleanup shall meet the requirements of Ecology's Model Remedies for Cleanup of Former Orchard Properties in Central and Eastern Washington. Ecology will provide technical guidance to the applicant and provide oversight to confirm that cleanup is completed.*" CP at 1387 (emphasis added). The plain language of the MDNS requires that the entire site be cleaned up prior to occupancy. The record lacks evidence of a piecemeal cleanup.

As to the Rossis' argument that the MDNS has conflicting directives, on one hand mandating cleanup by developers and on the other hand putting the burden on home purchasers, their argument is unpersuasive. The record does not support the Rossis' contention that the model remedy developer agreement pushes the burden to clean the site onto homebuyers or homebuilders.

The model remedy developer agreement, which the MDNS mandates be used, states that "[t]he developer is responsible for ensuring that the remedy is completed during general site development activities and prior to final plat approval." CP at 919. Further, "[f]uture homebuilders are responsible for ensuring appropriate remedy implementation on individual lots, prior to issuance of a certificate of occupancy for the residence on that lot." CP at 919. One of the requirements of the agreement is that a certificate of completion be issued confirming that the lot has been properly cleaned up before a certificate of occupancy will be issued. Thus, the model remedy developer agreement requires the "Property Owner and/or their contractor/homebuilder" to record a "'Residential Building Self-Certification' form," verifying cleanup has occurred, with the county auditor's office. CP at 923.

The model remedy developer agreement only seems to require home purchasers and builders to confirm cleanup has occurred by the developer, not to do the cleanup themselves. Thus, the Rossis' argument on this point fails.

The Rossis, aside from voicing their disagreement with the Model Remedy as the method of cleanup, do not make a persuasive argument that it was insufficient to remediate the contamination of the Project site. If the Model Remedy is applied and the Project site is properly cleaned up, as the MDNS requires it to be, environmental and health impacts will be properly mitigated.

C. LAND USE CONFLICTS BETWEEN RESIDENTIAL AND AGRICULTURAL USES

The Rossis argue that land use conflicts between the Planned Development and existing orchards exist that were not mitigated or buffered.

WAC 197-11-960(8)(a) requires that the environmental checklist ask: "What is the current use of the site and adjacent properties? Will the proposal affect current land uses on nearby or adjacent properties?" The Rossis argue that agricultural noises, smells, and pesticide drift from nearby orchards will impact the planned development and its occupants. However, the question is not: "How will the adjacent properties affect the proposal?" It is: "How will the proposal affect nearby properties?"

The Rossis do not explain what adverse effect the Project will have on nearby orchards other than to say new residents will complain about the nearby orchard owners' annoying farming practices. Yet, the orchard owners' lawful farming practices are protected from nuisance liability under Washington's right to farm statute. RCW 7.48.305; *Buchanan v. Simplot*, 134 Wn.2d 673, 680, 925 P.2d 610 (1998).

Further, the hearing examiner on appeal of the SEPA determination noted:

> The zoning for this area, set by Chelan County Board of Commissioners, is Low-Density Residential in the Peshastin Urban Growth Area. At the time the County set this zone, the area of the new zone was adjacent to active orchard uses. Therefore, the Chelan County Board of Commissioners has already determined that the current zoning for the subject property is compatible with adjacent and neighboring agricultural uses.

CP at 1625. As he pointed out, the Project is located within the Peshastin UGA that was slated for future development. The Board of County Commissioners determined that this area was appropriate for urban growth when it designated it as part of the UGA. The Rossis' land use compatibility grievances should have been taken up with the Board of County Commissioners when they were designating land in Peshastin as a part of the UGA and adopting the Comprehensive Plan.

There was nothing for the MDNS to address regarding land use compatibility. The Rossis do not explain how the Project will impact adjacent orchard owners and the environmental checklist question they cite to does not require consideration of adjacent orchard owners' impact on the Project. Buyers of homes in the planned development must do so knowing they are near property being used for agricultural purposes.

D. TRAFFIC IMPACTS

The Rossis argue that the hearing examiner erred on appeal of the SEPA determination when he concluded traffic impacts were adequately addressed in the MDNS. The Rossis contend that traffic impacts were not adequately addressed by the MDNS and that traffic issues still need to be mitigated.

43

The MDNS states the Applicant must construct Larson Road and Derby Canyon Road to meet the construction design of a rural collector road design and that intersection improvements are required pursuant to the revised TIS comments issued by Chelan County Public Works. The hearing examiner on appeal of the SEPA determination concluded the MDNS adequately mitigated any adverse traffic impacts.

The Rossis argue that their expert's testimony—that the TIS was inadequate—should have been adopted by the hearing examiner. The Rossis again take issue with the hearing examiner's finding that their expert was less convincing than Bergren's and the County's.

In regard to the data Ms. Leingang used to form her opinions, she testified that she did not collect data regarding traffic counts but instead based her opinions on information she gathered from local residents, "employees in the area," and a February site visit. CP at 225. She further testified that she did not do "any additional data collection" other than what was done in the TIS. CP at 224, 1062-72. But her overarching opinion was that the TIS contained inaccurate background conditions, the wrong peak-hour window, and the wrong analysis at the primary intersection. She testified that all of these items undermined the TIS's stated traffic impacts of the Project. Yet, Ms. Leingang did not do her own data collection. The hearing examiner specifically found that the "factual study and opinions by traffic expert, Michael Reed [sic] were more convincing that [sic] those opinions issued by Appellant's expert, Kassi Leingang." CP at 1627.

44

We accept the "factfinder's views regarding the credibility of witnesses and the weight to be given reasonable but competing inferences." *City of Univ. Place*, 144 Wn.2d at 652. We will not find persuasive what the hearing examiner found unconvincing. The MDNS required improvements to Larson Road and Derby Canyon Road as well as intersection improvements pursuant to the TIS and comments issued by Chelan County. The required improvements adequately mitigated traffic impacts posed by the Project.

### E. IMPACTS TO ORCHARD IRRIGATION

The Rossis argue that the impacts to orchard irrigation water posed by the Project were not considered and that this was error. Bergren responds that the Rossis' concerns regarding impacts to irrigation are entirely speculative.

The Rossis argue that the failure to identify irrigation line easements on the Property, along with the failure to consider the impacts that new users will have on the water supply, was error. In its decision on the SEPA appeal, the hearing examiner stated:

> Regarding the claimed environmental impacts regarding waterlines passing through the property, the Hearing Examiner specifically finds *that there is no factual or opinion evidence proving, by a preponderance of the evidence, that the irrigation lines through the subject property will be eliminated or otherwise disrupt the flow of water to adjacent properties. The Hearing Examiner finds that these claimed impacts are clearly speculative.* Irrigation water rights will not be impacted by the project. It's important to note that the Icicle Irrigation District was informed of the application and chose not to comment.

CP at 1627 (emphasis added).

The hearing examiner's finding is supported by substantial evidence. When asked if new users of the irrigation system would impact his water supply, Nick Rossi testified that he did not think "it directly affects our access to our water supply." CP at 248. Instead, his concerns were that people in the area would walk near or gather near his irrigation canal.

The Rossis speculate as to whether construction would potentially damage underground irrigation lines or make it difficult to access them in the event repairs were needed. These claims are speculative and the Rossis offer no citations to the record or law to support them.

The Rossis also argue in passing that the site plan violates the CCC because irrigation easements were not identified. CCC 12.12.020(1)(D) states:

> Every preliminary application for a land division shall consist of the appropriate application form, applicable fees and the following:
>
> (1) One copy of the preliminary map(s) which shall be legibly drawn at a standard engineering scale suitable to show the details necessary for review and shall include:
> . . . .
>      (D) Map of all easements, their purpose and dimensions, as known.

However, the final plat is required to show all easements that benefit and burden the site. Further, CCC chapter 12.12 is titled "Subdivisions" and, as previously detailed, a subdivision is not required until final plat approval.

The Rossis' arguments regarding impacts to orchard irrigation are speculative. The MDNS did not need to mitigate impacts to irrigation water because none are present.

F. WHETHER AN EIS SHOULD HAVE BEEN REQUIRED

Finally, the Rossis argue that an EIS should have been required because there are significant environmental impacts resulting from the Project that are not addressed or mitigated. For the reasons stated above, an EIS was unnecessary. The MDNS appropriately mitigated any significant environmental impacts resulting from the Project.

CONCLUSION

Finding no error in the hearing examiner's decision affirming issuance of the MDNS, we affirm.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Cooney, J.

WE CONCUR:

_____          _____
Fearing, C.J.                                      Pennell, J.

47